UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
In re:

KAHN PROPERTY OWNER, LLC,

Debtor.
---------------------------------------------------------X

Chapter 11
Case No. 25-72946-LAS

# CHAPTER 11 DEBTOR'S FOURTH AMENDED DISCLOSURE STATEMENT

**LAMONICA HERBST & MANISCALCO, LLP**
Attorneys for Kahn Property Owner, LLC
Chapter 11 Debtor

By: Joseph S. Maniscalco, Esq.
Adam P. Wofse, Esq.

3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
(516) 826-6500

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN (DEFINED BELOW). ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN OF REORGANIZATION ("**PLAN**") PROPOSED BY KAHN PROPERTY OWNER, LLC ("**DEBTOR**"). NO OTHER REPRESENTATIONS CONCERNING THE DEBTOR, THE VALUE OF ITS ASSETS OR BENEFITS OFFERED UNDER THE PLAN HAVE BEEN AUTHORIZED.

THE APPROVAL OF THE DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS OF THE DEBTOR TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE, IF ANY, UPON THE PLAN. COURT APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A RECOMMENDATION ON THE MERITS OF THE PLAN. A COPY OF THE PLAN IS ANNEXED HERETO AS **EXHIBIT 1** AND DESCRIBED HEREIN.

ANY REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN YOUR ACCEPTANCE WHICH ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION WHETHER TO APPROVE THE PLAN.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION; NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS DOCUMENT WAS COMPILED FROM INFORMATION OBTAINED BY THE DEBTOR AND FROM OTHER SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. ALL CREDITORS AND OTHER INTERESTED PARTIES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

# TABLE OF CONTENTS

Page


I INTRODUCTION ... 1
A. Background ... 1
B. The Plan Confirmation Process ... 2

II SUMMARY OF PLAN ... 3
A. Source of Information ... 3

III BACKGROUND OF OHEKA CASTLE AND THE DEVELOPMENT OF THE RESIDENCES AT OHEKA CASTLE ... 4

IV HISTORY OF THE CHAPTER 11 CASE ... 8
A. The Debtor's Business and Pre-Petition History ... 8
B. The Debtor's Loans ... 9
C. The State Court Foreclosure Action and Appeal ... 10
D. The State Court Dispute over Development Rights ... 13
E. The Debtor Lifted the Stay to Pursue the Appeals ... 16
F. 135 WG's Attempt to Sell the Debtor's Property ... 16
G. The Bankruptcy Filing ... 17
H. Retention of Professionals ... 18
I. Claims Bar Date ... 19

V THE DEBTOR'S PLAN ... 19
A. Explanation of Chapter 11 ... 19
B. Claims ... 20
C. Classes Of Claims or Interests ... 20
Unclassified Claims ... 20
1. Administrative Expense Claims ... 20
2. Fees and Expenses of United States Trustee ... 21
3. Priority Tax Claims: ... 21
Classified Claims ... 21
D. Treatment of Allowed Claims ... 22
Allowed Administrative Expense Claims ... 22
United States Trustee Claims ... 22
Class 1 Claim – Allowed Secured Claim of 135 WG ... 23
Class 2 Claims – Allowed General Unsecured Claims ... 24
Class 3 Interests – Allowed Member Interests ... 24

VI EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 24

VII IMPLEMENTATION OF THE PLAN ... 26

VIII FEASIBILITY ... 28

IX CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ... 28

X VOTING ... 28

XI REQUIREMENT FOR CONFIRMATION ..... 29
A. Confirmation Hearing ..... 29
B. Objections to Confirmation ..... 29
C. Acceptance of the Plan ..... 29
D. Confirmation of the Plan ..... 30

XII EFFECT OF CONFIRMATION; INJUNCTION; EXCULPATION ..... 30
A. Effect of Confirmation ..... 30
B. Injunction ..... 30
C. Exculpation ..... 31

XIII ALTERNATIVES TO THE PLAN AND OTHER CONSIDERATIONS ..... 32
A. Alternatives to the Plan ..... 32
(i) Dismissal ..... 32
(ii) Conversion to Chapter 7 ..... 32
B. Best Interests of Creditors ..... 33
C. Liquidation Analysis ..... 34

XIV RECOMMENDATION OF THE DEBTOR ..... 35

XV ADDITIONAL INFORMATION ..... 35

XVI TAX CONSEQUENCES ..... 35

XVII CONCLUSION ..... 36

# I
# INTRODUCTION

## A. Background

Kahn Property Owner, LLC ("Debtor") submits this Fourth Amended Disclosure Statement ("Disclosure Statement") pursuant to Section 1125 of Title 11 of the United States Code ("Bankruptcy Code"), to the creditors of the Debtor ("Creditors") in connection with the: (i) Debtor's Third Amended Chapter 11 Plan of Reorganization dated August 12, 2026 proposed and filed by the Debtor ("Plan") with the United States Bankruptcy Court for the Eastern District of New York ("Bankruptcy Court"); and (ii) hearing on confirmation of the Plan to be scheduled by further notice and/or Order of the Court. Unless otherwise defined herein, all capitalized terms contained herein will have the meanings ascribed to them in the Plan.

Attached as an Exhibit to and accompanying this Disclosure Statement is a copy of the following:

Exhibit 1 – The Plan
Exhibit 2 – Conceptual Site Plan
Exhibit 3 – Picture (Map) Road and Spur
Exhibit 4 – Corporate Structure Chart
Exhibit 5 – Declaration of Lonnie Ruffo, P.E., M.L.E.
Exhibit 6 – Appraisal
Exhibit 7 – Liquidation Analysis

BALLOTS ARE BEING PROVIDED TO HOLDERS OF CLAIMS AND/OR INTERESTS IN CLASSES 1, 2 AND 3 BECAUSE CLASSES OF IMPAIRED CLAIMS AND/OR INTERESTS ARE PERMITTED TO VOTE ON THE PLAN, WHEREAS, CLASSES THAT ARE UNIMPAIRED ARE NOT ENTITLED TO VOTE, AND ARE PRESUMED TO HAVE CONCLUSIVELY ACCEPTED THE PLAN.

**B. The Plan Confirmation Process**

The Bankruptcy Court approved this Disclosure Statement as containing adequate information to permit creditors of the Debtor to make a reasonably informed decision in exercising their right, if any, to vote upon the Plan. Approval of this Disclosure Statement does not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan. Each Creditor should read this Disclosure Statement and the Plan in their entirety.

Pursuant to various provisions of the Bankruptcy Code, only classes of claims that are "impaired" under the terms and provisions of a plan are entitled to vote to accept or reject such plan.

In accordance with Section 1128 of the Bankruptcy Code, the Bankruptcy Court shall schedule a hearing, pursuant to a separate notice or Order of the Court, to consider confirmation of the Plan ("Confirmation Hearing"), in the Courtroom of the Honorable Louis A. Scarcella, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alfonse M. D'Amato U.S. Courthouse, 290 Federal Plaza, Courtroom 970, Central Islip, New York 11722. Objections, if any, to confirmation of the Plan shall be served and electronically filed with the Bankruptcy Court in accordance with such further notice from and/or Order of the Court. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned hearing date made at the Confirmation Hearing or at any subsequent adjourned date.

# II
# SUMMARY OF PLAN[1]

The classification and treatment of Claims under the Plan are set forth in Article V below. The Plan provides for payments on Allowed Claims in accordance with the priorities for claims as set forth under the Bankruptcy Code and applicable non-bankruptcy law. The Plan contemplates one of three scenarios for a successful case: (1) a consensual global resolution to be achieved with 135 WG (as defined herein); (2) a private sale of the Property including Development Rights (as defined herein); or (3) an auction sale of the entire Property (and assignment of operating leases).

## A. Source of Information

The information contained in this Disclosure Statement was prepared by management of the Debtor, in consultation with counsel, based upon the Debtor's books and records, the pleadings filed in the case and in the pre-petition litigations, the Debtor's bankruptcy petition and schedules, and preliminary review of all proofs of claim timely filed with the Bankruptcy Court. The estimates of Claims set forth herein may vary from the final amount of Claims allowed by the Bankruptcy Court, however, the Debtor believes that the figures and dollar amounts reflected herein are reasonably accurate according to currently filed claims and scheduled debts of creditors that have not filed a proof of claim. While every effort has been made to ensure the accuracy of all such information, the information presented herein is unaudited and has not been examined, reviewed, or compiled by an independent public accountant.

[1] This Disclosure Statement includes comments and corrections from the Debtor's Secured Lender, 135 W Gate Drive LLC (defined as 135 WG below). Notwithstanding the foregoing, 135 WG continues to reserve all of its rights to object to the Disclosure Statement and Plan.

## III

## BACKGROUND OF OHEKA CASTLE AND THE DEVELOPMENT OF THE RESIDENCES AT OHEKA CASTLE

The Property (defined herein) consists of land containing approximately 21 acres on which sits the Oheka Castle, the former residence of Otto Herman Kahn constructed between 1914 to 1919. The Castle and the surrounding property are extremely valuable, with breathtaking views on four sides.

Gary Melius ("Melius") purchased the Property in 1984, and over the next several decades undertook substantial massive renovations at a cost of tens of millions of dollars. The Castle was designated as a national historic landmark in 1991.

In 1997, the Huntington Town Board ("Town Board") issued an Additional Use Permit allowing Oheka Castle, which was zoned for residential use, to be developed into a banquet facility, designer showcase, and health spa. Since that time, Melius has transformed the Castle into one of the World's pre-eminent banquet catering facilities, hosting weddings, corporate events, and special occasions, and serving as the preferred backdrop of celebrities for videos and photography. The Castle is a member of the Historic Hotels of America, and contains 32 luxury guestrooms and suites. Oheka Castle also boasts a beautiful restaurant called OHK, which is open seven days a week, and contains smaller ancillary rooms and structures that can accommodate revenue sources that have remained untapped.

The Property is zoned as R-20 Residence District, which permits only single-family dwellings, public schools, parks, and similar uses. The Property also resides in a Historic Building Overlay District ("HBOD"), which allows owners of historic properties that are residentially zoned

to offset the high costs of maintenance and preservation of historic structures with revenue generated from commercial activity. (See Town Code 198-42.1).[2]

Due to vision of Mr. Melius, he had a desire to make the Oheka Castle and the surrounding area the most desirable destination venues, and offer a full array of features, including a spa, along with high end residences on the southeast corner of the Property.

On March 12, 2012, in connection with that vision, the Town Board approved an application by the Debtor to rezone an underused 5.18±-acre portion of the Oheka Property ("Oheka Parcel"), together with an adjacent 13.2-acre portion of the Cold Spring Country Club ("Country Club") consisting of mainly wooded land ("Country Club Parcel"), from R-20 to a Residence-Open Space Cluster District ("R-OSC"). The R-OSC zoning designation allowed for the clustering of residential units on 15 acres or more of property, provided that a certain amount of open space is preserved for recreational use.. (Town Code 198-21.3) The approval of the 2012 application allowed for the Debtor and the Country Club the proceed with a clustered residential development consisting of a of 190 luxury condominium units on the combined 18.38+/- property.[3] The vision was for the Country Club and the Debtor to pursue this joint opportunity. At the time, the Country Club was amenable to the Debtor's development vision and access to the property for the purpose of making that vision a reality. The rezoning permitted a residential condominium development on the new 18.38± acre property containing a maximum of 190 units, which were to be identified as the Residences at Oheka Castle ("Residences").

[2] 135 WG does not agree with this interpretation of the Town Code and as part of the pending appeal identified in Section D below, asserts the appeal addresses whether (i) HBOD permits uses other than those permitted as of right in the underlying zoning district that are detached from the historic building itself; and (ii) whether a change in density is considered a change in use within the meaning of the HBOD ordinance. The Debtor does not agree with 135 WG.

[3] The Country Club piece is primarily wooded land with no use ("Country Club Wooded Land").

Over the ensuing years, the relationship between the Debtor and the Country Club broke down. During that time, the Debtor paid the Country Club a total of $6,000,000 ($1MM per year over six years) for extensions of the right to acquire the Country Club Parcel. In view of ongoing disputes between them, the Debtor began pursuing alternative development options involving only the Oheka Parcel.

On or about June 17, 2022, the Debtor filed a zoning change application with the Town of Huntington and Town Board to allow for the construction of 95 luxury condominium units on the 5.18 acre Oheka Parcel ("Oheka Residences"). A copy of the conceptual site plan pictures of the Oheka Castle along with the Great lawn and identification where the Residences would be built is annexed hereto as **Exhibit 2**. Primary access to the Oheka Residences would be over East Gate Drive, which is connected to the Oheka Parcel via a road measuring approximately 200 feet ("Spur"). The Spur, although privately owned by the Country Club, has been in continuous use over many decades as a service entrance to Oheka Castle, such that the Debtor believes it has acquired a prescriptive easement ("Easement"). The Country Club allowed unfettered access of the Spur to the Debtor for decades. A copy of a picture of the Spur is annexed hereto as **Exhibit 3**.

The Country Club opposed the Oheka Residences, in part because it claimed that the Debtor does not have the right to use East Gate Drive and the Spur for primary ingress and egress.

On March 20, 2023, the Town Board conditionally adopted Resolution No. 2013-140 for the enactment of a new Local Law modifying the Historic Overlay District in which the Oheka Parcel sits, to allow for the development of the desired condominiums ("Development Resolution"). The Development Resolution is conditioned upon, among other things, the Debtor securing the legal right to use East Gate Drive as contemplated, and provides that if the Debtor is

unable to secure such legal right, it must apply to the Town Board for a modification to the plan, identifying an alternate access point.

The adoption of the Resolution appears to have frustrated the Country Club. The Country Cub then sought to block the Oheka Development Project. The Country Club then brought an action seeking to prevent the Debtor from obtaining access to the Residences from East Gate Drive, and prevent the Debtor from completing its condominium development. The Debtor brought an action against the Country Club seeking a declaration as to the Debtor's permitted use easement over East Gate Drive. The Debtor asserts that the access road in dispute was created as a service entrance to Oheka Castle and has been used by the Debtor, with the Country Club's knowledge and consent, for almost 100 years.[4] While the Country Club sought a preliminary injunction, on October 30, 2023, the Supreme Court denied the request (NYS Supreme Court, Index No. 622421/2021) ("Easement Action").[5] As set forth herein, the Debtor removed the Easement Action, which will be heard before this Court. The Easement Action has a discovery schedule pursuant to which, at present, all fact discovery will be completed by July 15, 2026, as may be amended. See Adv. Pro. No. 25-08097-LAS, at ECF 14.

The Debtor believes it possesses lucrative Development Rights in the Property. The Debtor has been developing relationships with third parties to consummate a deal but has been hampered continuously by the Foreclosure Action (defined herein). The Debtor has been advised that East Gate Land LLC ("East Gate Land"), an affiliate of 135 WG has completed the purchase of Country Club Wooded Land in December 2025 (the "Parcel"). 135 WG seeks to foreclose on the Property. The Debtor believes that East Gate Land seeks to complete its own development of the Parcel. The

4 The road easement is a crossroad of approximately 200 feet connecting East Gate Drive to the road on the Debtor's Property.

5 East Gate Land LLC is an affiliate of 135 WGand has taken over certain of the arguments of the Country Club.

Debtor believes this will require East Gate Land to go back to the Town to seek approval for its own development on the Parcel. The parties are in a litigation dispute over the Parcel, access to the Debtor's approved development to construct the Residences and East Gate Land's acquisition of the Parcel.

## IV
## HISTORY OF THE CHAPTER 11 CASE

### A. The Debtor's Business and Pre-Petition History

Kahn Property Owner, LLC ("Debtor") is a privately owned New York limited liability. The Debtor is owned by Kahn Associates, LLC ("Kahn Associates"), a Delaware limited liability company (99%) and Kahn MM, Inc. (1%). Kahn Associates is owned by Melius (39%) and the balance distributed among his family members. The Debtor and its affiliated entities corporate chart are annexed hereto as **Exhibit 4**.

The Debtor is a single asset real estate debtor within the meaning of Bankruptcy Code section 101(51B).

The Debtor is the owner of the real property at 135 West Gate Drive, Huntington NY 11743 which is comprised of 22.3 acres in the gold coast of Long Island ("Property"). On the Property sits the iconic Oheka Castle & Resort ("Oheka Castle") which operates as a restaurant and catering facility for exclusive and extravagant weddings, parties, corporate events and the like. The Debtor operates the Property and Oheka Castle operates as a separate entity. The Debtor does not have any employees. Gary Melius is fully familiar with the operations of the Property and Oheka Castle. The Debtor's affiliates operate and manage the catering facility, restaurant and related businesses. This is the personal residence of Gary Melius and he works each day assisting with the catering, the restaurant, and all aspects of the Property and the business.

On or about August 1, 2007, the Debtor as landlord ("Landlord") entered into a lease agreement (the "Lease") with Oheka Management Corp and Oheka Catering, Inc. (collectively, the "Tenants") for the space at the Property. The Tenants operate at the Property and run the catering facility and restaurant. According to the Debtor, the Lease is for a period of twenty (20) years ending on July 27, 2027, with available options. The Receiver has been in place on behalf of the Debtor Landlord and the affiliated entities of the Debtor, who are the Tenants. According to the Debtor, and the books and records of the Debtor, the Tenants have paid and/or booked accrued rent each year to the Landlord. Approximately $15 million in accrued rent is due and owing from the Tenants to the Debtor (the Receiver has not paid over any rents); however, the Debtor believes such accrued rent is uncollectible.

The Debtor believes it can trace the source of its pre-petition financial difficulties to a foreclosure action commenced by its then senior lender and a continuing dispute over the calculation of interest, default interest and related charges, and allegations by the Debtor that the senior lender failed to provide an accounting and setoff of money paid. From inception of the foreclosure action in 2016, the Debtor has asserted that the secured lender engaged in an improper default in an effort or aim to control the Property, take over its operations and develop it with luxurious condominiums absent the Debtor. 135 WG has disputed such allegations and believes the Debtor has always been provided with its accounting and calculations.

**B. The Debtor's Loans**

On or about July 12, 2013 a series of loan documents were executed between the Debtor and the U.S. Bank National Association, as Trustee, Successor in Interest to Bank of America, National Association, as Successor by Merger to Lasalle Bank for the Registered Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2007-LDPl2, Commercial Mortgage Pass-Through Certificates, Series 2007-LDPl2 ("Secured Lender") whereby a loan was extended to the Debtor

secured by a mortgage encumbering the property. The Loan, in the principal amount of $29,792,384.03, consists of the following loan documents: (i) two promissory notes ("Tranche A Note" and "Tranche B Note") in the principal amounts of $22,750,000.00 and $7,042,384.03, respectively; (ii) the Second Amended, Restated and Consolidated Mortgage, Assignment of Leases and Rents and Security Agreement ("Mortgage"); (iii) the Amended and Restated Cash Management Agreement ("CMA"); (iv) the Amended and Restated Reserve and Security Agreement ("Reserve Agreement"); and (v) the Reaffirmation and Omnibus Agreement ("Omnibus Agreement") (collectively referred to as the "Loan Documents").

The Loan Documents were entered into as a result of a prior loan maturity with the original lender who purchased the loan on the commercial backed securities market. The Loan Documents provided that the note was for a period of five-years that matured in August 2018.

Part of the Loan Documents was the CMA whereby the Debtor caused an LLC owned by Melius to contribute $1,700,000 (MM) to pay reserve funds controlled by the Secured Lender (now 135 WG). Despite what it claims to have been repeated demands, the Debtor has yet to receive an accounting of those funds. The purpose of the loan was to provide renovations to the Property and the Oheka Castle. The renovations included, among other things, roofing, structural, sprinkler systems, restaurant, renovations, ballrooms, gardens, etc.

According to the Debtor, over the next several years after the loan closing, it had massive difficulty obtaining reimbursement from the Secured Lender related to capital expenditures made at the Property and the Oheka Castle. The Debtor contends that these delays caused extensive financial strain on the Debtor and its affiliated entities.

## C. The State Court Foreclosure Action and Appeal

On June 24, 2016, U.S. Bank National Association, as Trustee Successor in Interest to Bank of America, National Association, as Successor by merger to LaSalle Bank for the Registered

Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2007-LDP12, Commercial Passthrough Certificates, Series 2007-LDP12, acting by and through its Special Servicer, LNR Partners, LLC (135 WG's predecessor) commenced an action in Supreme Court, Suffolk County against Kahn Property Owner, LLC, Gary Melius, Oheka Catering I LLC, Oheka Management Corp, et al., under Index Number 609493/2016 ("Foreclosure Action"). The Debtor and related defendants filed an answer with defenses.

By Order dated January 3, 2019, receiver Jeffrey Kolessar ("Receiver") was appointed in control and management of the affairs of the Debtor and of the Oheka Castle hotel,[6] restaurant and all operations ("Receiver Order"). The Debtor asserts that the Receiver is holding funds the Debtor's estate may be entitled to however any such funds are subject to 135 WG's senior secured lien. The Receiver, who is located in Philadelphia, is not involved in the day-to-day management or operations of the Debtor or the affiliated entities but exercises his duties approving the salary and related expenses for the business under his Receiver Order. Gary Melius and his staff have been managing the day-to-day operations continuously and continue to manage the day-to-day affairs of the Debtor and its related entities. Melius earns an annual salary of $58,000 from an affiliate of the Debtor.

While the Debtor has not filed any motion in the State Court to remove the Receiver as concerns the Debtor, nor have any of the non-debtor entities, the Debtor's affiliated entities also believe that the Receiver should look to maximize value for the benefit of the estate and its creditors. Based on its investigation, the Debtor asserts that the Secured Lender never sought to be paid any adequate protection, protective advances or any monthly net revenue profit from the Receiver since 2019. 135 WG disputes this assertion. The Debtor believes that the non-debtor

[6] The hotel portion consists of 32 rooms that are rented to guests attending a wedding.

affiliated entities are profitable entities but nothing has been done to maximize the value of those entities to pay down the secured debt.[7]

On March 25, 2019, the Supreme Court in the Foreclosure Action granted partial summary judgment in favor of Plaintiff Lender, dismissed defendants' affirmative defenses, and appointed a referee to compute. The Debtor appealed ("SJ Appeal").

On June 15, 2022, the Appellate Division reversed the Supreme Court decision finding Plaintiff Lender had failed to establish prima facie, the Debtor's default by providing supporting business records with its underlying Declaration.

In the SJ Appeal, the Debtor argued that the only default the Plaintiff Lender claimed was a failure to make the November 2015 and December 2015 monthly payments. Plaintiff Lender then accelerated the maturity of the mortgage notes on January 5, 2016 and demanded all amounts on the mortgage notes be paid on that date. The Debtor further argued that Plaintiff Lender supplied no payment history or any other business records to support the conclusion that the Borrower failed to make the November 2015 and December 2015 payments, instead relying upon the narrative affidavit of an employee of Plaintiff Lender's special servicer, LNR Partners, LLC.[8] Finally, the Debtor argued that one year after commencing the Foreclosure Action, the Plaintiff Lender changed its position to argue that defaults occurred after the commencement of the Foreclosure Action (failure to pay insurance premium and maturity date of the loan – August 2017). The Lender disputed each of the allegations asserted by the Debtor.

On August 2022, less than two months after the reversal, the Supreme Court granted Plaintiff Lender's request to file a second motion for summary judgment over the Debtor's

---

[7] The Debtor believes this based on a review of the confidential monthly receiver reports received from the Receiver.

[8] At the time of the alleged payment default, the Debtor asserts that the Plaintiff Lender was holding over $2 Million in reserve funds for construction renovations conducted.

objection. The Debtor opposed the granting of the second request to file a second motion for summary judgment.

On February 27, 2023, the Supreme Court in the Foreclosure Action granted partial summary judgment in favor of the Secured Lender on the second summary judgment motion. In its decision dated February 27, 2023, the Supreme Court found, among other things, that the Secured Lender had established that, as set forth in the loan documents, it was not required to give the defendants notice of their payment default or an opportunity to cure.

On March 15, 2023, the Debtor appealed the second summary judgment decision ("2023 Appeal"). The 2023 Appeal has been fully briefed and is awaiting oral argument. However, it should also be noted that the Debtor subsequently appealed not just this decision, but on May 21, 2025 [NYSCEF Doc. No. 1071] also appealed the Judgment of Foreclosure and Sale entered by Judge Hudson on April 4, 2025 [NYSCEF Doc. No. 1068] to the appellate court. The Debtor filed on April 8, 2026 its first appellate brief in regard to this separate appeal.

On or about June 7, 2023, four months after the second summary judgment motion was decided, and while the Appeal was pending, the original Secured Lender sold the note to a new buyer identified as 135 W. Gate Drive, LLC ("135 WG"). 135 W. Gate was the original owner of Tranche B and then purchased the Tranche A portion of the total loan. The Debtor believes 135 WG purchased the Note with knowledge of the second grant of summary judgment, the pending Appeal and all of the Debtor's defenses.

**D. The State Court Dispute over Development Rights**

On December 1, 2021, the Debtor, among others, filed an action entitled Kahn Property Owner, LLC and Cold Spring Hills Development, LLC, v. Yehoshua Lieb Fruchthandler, Oheka Development LLC; FBE Limited III, LLC d/b/a FBE Limited, LLC and Cold Spring Country

Club, Inc., which is pending in the Supreme Court of the State of New York, County of Suffolk ("State Court"), under Index No. 622421/2021 ("Easement Action").

The Debtor, as Plaintiff, argued that defendant FBE entered into a non-disclosure agreement and contract with the Debtor to develop the Property with the approved development rights with the Country Club (the "Club Land"). After a dispute arose, the Debtor alleged that FBE violated the non-disclosure terms and went behind the Debtor to negotiate a separate deal with the Country Club and communicated with the Debtor's lender at the time to foreclose against the Property and take over the Debtor.

The defendants filed motions to dismiss which were denied by order dated August 23, 2022. Thereafter, pursuant to an Amended Order clarifying dated September 21, 2022, the Court dismissed with prejudice two of the counts brought by the Debtor, the first count (seeking a preliminary injunction restraining the FBE Defendants from buying the Club Land) and the second count (seeking a permanent injunction preventing the FBE Defendants from buying the Club Land).

The defendants then filed their answers to the complaint and the Country Club filed a counterclaim asserting that the Debtor cannot build its development project without the use of the Country Club's Road, and to prevent the Debtor from developing the project. As set forth herein, the Debtor and the Country Club were no longer in contract after the Debtor paid $6MM in extension fees to the Country Club.

By notice of removal dated October 6, 2025, the Debtor removed the Easement Action to the Bankruptcy Court which has been assigned Adv. Pro. Number 25-8097-LAS. The Court has entered a scheduling order in connection with that action and a more fulsome discussion of the status of the Easement Action is contained in Section III above.

In connection with the dispute in the Easement Action, the Debtor sought and obtained the Development Resolution dated March 20, 2023 which authorized the Debtor to develop the Oheka Residences project without the Country Club ("Development Rights").[9]

On or about April 19, 2023, the Country Club filed a separate action in Supreme Court identified as Cold Spring Country Club, Inc. and Cold Spring Development Partners, LLC vs. Town of Huntington, Town Board of the Town of Huntington and Kahn Property Owners, LLC under Index Number 609827/2023 (the "Article 78 Action").

The case was considered by the Supreme Court as a hybrid Article 78 proceeding, declaratory judgment/injunctive relief action, challenging the Town's adoption of Resolution 2023-140 ("Local Law").

The Country Club moved by order to show cause and the parties fully briefed the issue. By decision and order dated October 23, 2023, the Court dismissed the Article 78 portion of the action and all other claims asserted therein.

On November 21, 2023, the plaintiff Country Club and Cold Spring Development Partners, LLC[10] filed a notice of appeal (the "2023 Appeal"). This appeal was fully briefed over a year ago on March 12, 2025 and the automatic stay was lifted on November 25, 2025 to allow that appeal to proceed.

On October 29, 2025, the Debtor removed the Article 78 Action to the Bankruptcy Court. On March 3, 2026 it was subsequently remanded as the Bankruptcy Court had no jurisdiction over a matter that was on appeal.

---

9 The term Development Rights shall include the land consisting of the 5.1 acre parcel. Annexed as **Exhibit 5** is a Declaration of Lonnie Ruffo, P.E., M.L.E., engineer and consultant, concerning the current status of the Development Rights project indicating that it is "shovel ready" in the immediate future.

10 Herrick Feinstein, LLP represents Cold Spring Development Partners LLC, the contract vendee of the Country Club parcel. The Country Club is represented by Howard Avurtine, Esq.

**E. <u>The Debtor Lifted the Stay to Pursue the Appeals</u>**

As set forth herein there is currently an appeal pending in the Appellate Division-Second Department, assigned Docket No. 2025-06289, that was taken from the entry of the Commercial Foreclosure Judgment of Foreclosure and Sale in the Foreclosure Action ("2025 Appeal" and together with the 2023 Appeal, collectively, "Appeals"). These appeals are not consolidated and continue on independent paths within the appellate courts.

The continued prosecution of the Foreclosure Action and the Appeals were stayed by virtue of the filing of this Chapter 11.

By Stipulation and Order dated October 10, 2025 [ECF 43], the Debtor and the Secured Lender obtained permission from the Bankruptcy Court to lift the automatic stay and pursue the Appeals. The Debtor filed a motion to restore the oral argument scheduling to the calendar and obtained approval by the Bankruptcy Court for the retention of appellate counsel to expedite the 2023 Appeal.

The 2023 Appeal has been fully briefed and is ready for oral argument and decision. The Debtor is confident that the second appeal will reverse the decision of the Supreme Court and find the default to be improper, requiring a new calculation of interest and not allowing the Lender to obtain default interest thereon. 135 WG believes the appellate court will not reverse the Supreme Court's decision.

**F. <u>135 WG's Attempt to Sell the Debtor's Property</u>**

135 WG proceeded to complete the Foreclosure Action and sale. On April 4, 2025, the Supreme Court granted a judgment of foreclosure and sale. The Debtor appealed the judgment of foreclosure and sale.

While the Appeal was pending, 135 WG scheduled a sale of the Property and the Debtor believes attempted to sell the property without engaging in a commercially reasonable sale process.

135 WG believes it followed the necessary state court procedures in connection with a foreclosure sale. The sale was scheduled for August 7, 2025 at the steps of Huntington Town Hall. The Debtor sought bankruptcy protection prior to the sale date.

**G. The Bankruptcy Filing**

On July 31, 2025 ("Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court. The Debtor's goal since well before the Petition Date has been to either refinance, sell its lucrative Development Rights, or restructure its affiliated businesses to maximize value, and pay its creditors. A sale of the entire Property is also contemplated to the extent a global resolution with 135 WG and/or a sale of the Development Rights does not occur.

Having been afforded the protections of the Bankruptcy Code, the Debtor has begun to stabilize its business and commence its reorganization efforts. Shortly after the filing, the Debtor allowed the Receiver to remain in place pending the Debtor's investigation and identification of other sources of revenue [Dkt. No. 37]. Since the Filing Date, the Debtor has entered into a Stipulation lifting the automatic stay allowing this appeal to be concluded [Dkt. No. 43]. The Debtor has also filed the necessary pleadings to remove the Easement Action and retained special counsel to adjudicate such Easement Action.

During the bankruptcy, the Debtor has met with numerous interested buyers of the Development Rights and the entire Property. At the same time, the Debtor was negotiating with 135 WG to reach a consensual resolution that would benefit all parties and creditors.

Despite extensive efforts by the Debtor to negotiate a resolution with 135 WG, no agreement has been reached.

**H. Retention of Professionals**

The Debtor employed the law firm of LaMonica Herbst & Maniscalco, LLP as counsel to the Debtor. This Court entered an Order dated September 29, 2025 authorizing and approving the retention of LaMonica Herbst & Maniscalco, LLP as counsel to the Debtor. See Dkt. No. 36.

The Debtor employed the law firm of Jaspan Schlesinger Narendran LLP, as special litigation counsel for the Easement Action and the Article 78 Action, both of which have been removed to the Bankruptcy Court (and the latter which has been subsequently remanded). The Court entered an Order dated November 25, 2025 authorizing and approving the retention of Jaspan Schlesinger Narendran LLP as special litigation counsel to the Debtor. See Dkt. No. 69.

The Debtor employed the law firm of Pollack, Pollack, Isaac & DeCicco, LLP as special appellate counsel in connection with the Appeals. This Court entered an Order dated November 26, 2025 authorizing and approving the retention of Pollack, Pollack, Isaac & DeCicco, LLP as special appellate counsel to the Debtor. See Dkt. No. 70.

The Debtor employed the firm of Hidalgo Williams Blueprint Solutions LLC as financial advisor to the Debtor to assist the Debtor in the refinance, restructuring and/or sale of the Development Rights. This Court entered an Order date January 21, 2026 authorizing and approving the retention of Hidalgo Williams Blueprint Solutions LLC as financial advisor to the Debtor. See Dkt No. 82.

As for the potential auction sale contemplated under the Plan, the Debtor is presently interviewing several brokers (some of which were suggested by 135 WG), and such employment will be sought upon application and Order of the Court.[11] The Debtor has also been negotiating and revising terms and conditions of an auction sale in consultation with 135 WG.

---

[11] To the extent a broker is employed it is anticipated that such a broker would charge a commission of 2-4% for either of the potential sales.

**I. Claims Bar Date**

By Order of the Court dated August 20, 2025, the Court fixed October 15, 2025 ("Bar Date") as the date by which creditors must timely file a proof of claim ("Proof of Claim"). Accordingly, any Creditor having filed a Proof of Claim with the Bankruptcy Court on or before the Bar Date, and whose Claim is deemed an Allowed Claim, will receive payment in accordance with the terms of the Plan. Any Creditor who failed to file a Proof of Claim on or before the Bar Date (i.e., October 15, 2025), which is not listed on the Debtor's Schedules or is listed as "disputed," "contingent" or "unliquidated" on the Debtor's Schedules, may not receive a distribution under the Plan.

## V
## THE DEBTOR'S PLAN

**A. Explanation of Chapter 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor seeks to reorganize its business and financial affairs. A debtor may also liquidate its assets and wind up its affairs in Chapter 11. The formulation and confirmation of a plan of reorganization or liquidation is the principal purpose of a Chapter 11 case. A plan of reorganization (which may include a plan of liquidation) sets forth the means of satisfying or discharging the holders of claims against a Chapter 11 debtor. Chapter 11 does not require that each holder of a claim against a debtor vote in favor of a plan in order for the Bankruptcy Court to approve a plan. If any class of claimants is "impaired" by a plan, the plan must be accepted by at least one "impaired" class of claims. A claim that will not be repaid in full, or a Claimant whose legal rights are altered, or an interest that is adversely affected, is deemed "impaired."

The holder of an impaired claim is entitled to vote to accept or reject the plan if the claim has been allowed under Section 502 of the Bankruptcy Code, or temporarily allowed for voting

purposes under Bankruptcy Rule 3018. Acceptance by a particular class must be by a majority in number and two-thirds (2/3) of the dollar amount of the total claims actually voting in the class.

**B. Claims**

Pursuant to the Bar Order, any Creditor who failed to file a proof of Claim on or before the Bar Date and was not listed on the Schedules or was listed as "disputed," "contingent" or "unliquidated" cannot be treated as a Creditor with respect to such Claim for purposes of voting on and receiving a Distribution under the Plan.

All Proofs of Claim filed in this case have been preliminarily reviewed, and to the extent necessary, the Debtor will further review such claims and may file objections to certain filed claims. The Bankruptcy Court will retain jurisdiction to adjudicate objections to claims brought by the Debtor, including any settlements or compromises of such claims. The Debtor reserves all rights to object to Claims.

The figures and information set forth below represent the Debtor's best estimate of the total amount of filed Claims in the case. These estimates have been developed by the Debtor based upon (i) an analysis of its books and records; and (ii) filed proofs of claim. By Order of the Bankruptcy Court, October 15, 2025 was set as the last date for filing Proofs of Claim with the Clerk of the Bankruptcy Court. There can be no assurance that the Claims that may be filed and allowed by the Bankruptcy Court will not exceed the amounts set forth or described herein. Nothing set forth in these schedules shall be deemed an admission by the Debtor as to the existence, validity, priority or amount of any claim asserted against the Debtor.

**C. Classes Of Claims or Interests**

**Unclassified Claims**

Administrative Expense ClaimsAllowed Administrative Claims are claims against the estate for any costs or expenses incurred during the Chapter 11 case that are allowed and entitled

to priority under Sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, but not limited to, all actual and necessary expenses, and all allowances of compensation or reimbursement of expenses of professionals retained by the Debtor to the extent permitted by the Bankruptcy Court.

Administrative Claims include claims of Professionals approved by Order of the Bankruptcy Court who have assisted in the administration of this case and the administrative proofs of claims that were filed with the Bankruptcy Court. This sum includes the fees and expenses of professionals retained pursuant to Orders of the Bankruptcy Court, namely Debtor's counsel and other professionals. Such professional fees are subject to Bankruptcy Court approval.

The Debtor has incurred professional fees for all professionals including its general bankruptcy counsel, special counsel and financial advisor in the aggregate approximate sum of $1.5 million.

Fees and Expenses of United States TrusteeThe Debtor shall pay all statutory fees and applicable interest due to the Office of the United States Trustee that come due up to and including the earlier of the date of entry of a final decree closing this Chapter 11 proceeding or of the date of entry of an order dismissing or converting the case to one under Chapter 7 of the Bankruptcy Code. The total fees that will be incurred and owed to the United States Trustee are unknown at this time and based upon quarterly disbursements made by the Debtor.

Priority Tax ClaimsNone.

**Classified Claims**

Class 1 Claim – Allowed Secured Claim. This class consists of the Allowed secured claim against the Property of mortgagee 135 WG. According to 135 WG, the amount owed to 135 WG on the mortgage as of October 15, 2025 is $56,552,098.93 (plus continued accrued interest to the extent allowable under applicable law and expenses).

On May 27, 2026, 135 WG provided a payoff statement to the Debtor. The Debtor disputes the claim, and will be filing a motion to estimate and object to the 135 WG claim.

Class 2 Claim – Allowed General Unsecured Claims. This class consists of the Allowed General Unsecured Claims. The claims in this class as currently filed are $28,895,234 (MM). $10,000,000 (MM) consists of alleged personal injury claims and will be relegated to claims against applicable insurance. There are other disputed claims which the Debtor will address through the claims allowance and disallowance process.[12] As such, the Debtor believes the total claims for this Class will be in the approximate amount of $12,000,000 (MM).

Class 3 Interests – This class consists of the Allowed Interests of the Debtor.

**D. Treatment of Allowed Claims**

Allowed Administrative Expense Claims

Administrative Expense Claims are unimpaired. Upon or after the Effective Date of the Plan, each holder of an Allowed Administrative Expense Claim shall be paid in full, or on such other date and upon such other terms as may be agreed upon by the holder of such Allowed Administrative Expense Claim and the Debtor. Debtor's counsel and any retained professional shall be paid in connection with an application to and Order of the Bankruptcy Court. Each holder of an Allowed Administrative Expense Claim shall be paid from available funds, which may include, to the extent necessary, proceeds (a) in connection with a global resolution with 135 WG, (b) from the private sale of the Property (including the Development Rights) or (c) from the auction sale of the Property. Holders of Administrative Expense Claims are not entitled to vote on the Plan and are deemed to have accepted the Plan.

United States Trustee Claims

---

[12] In addition, one nominal priority unsecured claim for a wedding deposit is improperly filed against the Debtor, and as such, the Debtor will object to the claim to the extent necessary.

The United States Trustee claims are unimpaired. The Debtor shall pay all statutory fees and applicable interest due to the Office of the United States Trustee that come due up to and including the earlier of the date of entry of a final decree closing this Chapter 11 proceeding or of the date of entry of an order dismissing or converting the case to one under Chapter 7 of the Bankruptcy Code.

Class 1 Claim – Allowed Secured Claim of 135 WG

Upon the Effective Date, the holder of the Allowed Class 1 Claim shall be paid in full, together with interest pursuant to applicable nonbankruptcy and bankruptcy law[13]: (a) in connection with a global resolution as agreed between the Debtor and 135 WG subject to approval Order of the Court; (b) from the proceeds of the private sale of the Property (including the Development Rights as well as the Opco Entities' (as defined herein) assets), or (c) from the auction sale of the Property (including the Development Rights as well as the Opco Entities' assets).

In connection with the above potential auction sale of the Property, proposed terms and conditions[14] of such sale shall be incorporated into a separate sale motion filed by the Debtor, which shall include 135 WG's right to credit bid the Allowed amount of its claim in this case at such auction sale.

To the extent that the Allowed Claim of 135 WG will be paid in full with interest and expenses as of the Effective Date, 135 WG has advised the Debtor that it intends to vote in favor

---

13 Subject to any motion brought by the Debtor in connection with proof of claim number 9 of 135 WG filed in this case, the Debtor will pay the Allowed Class 1 Claim of 135 WG in full with applicable interest and expenses as allowed by the Court.

14 The Debtor intends to attempt to achieve consensual auction sale terms and conditions with 135 WG, with each the Debtor and 135 WG reserving all rights with respect thereto.

of the Plan with respect to option 2, a private sale and provided 135 WG and the Debtor reach agreement on bidding procedures, it would vote in favor of a plan switching to option 3.

Accordingly, the Class 1 Claim is impaired, and therefore, such claimant is entitled to vote to accept or reject the Plan.

Class 2 Claims – Allowed General Unsecured Claims

Upon the Effective Date, each holder of an Allowed Class 2 Claim shall receive payment in full on account of such Allowed Claim, (a) in accordance with a global resolution with the Debtor and 135 WG pursuant to Court approval order, (b) from the proceeds of the private sale of the Property, its Development Rights and the Opco Entities, or (c) from the auction sale of the Property, its Development Rights and the Opco Entities, upon and after payment of the Allowed Class 1 Claim as set forth above, and the Court approved professional and administrative claims. Accordingly, Class 2 Claims are impaired, and therefore, holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

Class 3 Interests – Allowed Member Interests

Class 3 Interests consist of the member interests of the Debtor held by Gary Melius and related family members as set forth in the corporate structure chart. Upon the Effective Date and payment of the above Class 1 and Class 2 Claims and administrative claims, the holders of the Class 3 Interests shall receive the balance of the sale proceeds on account of such interests. Class 3 Interests are impaired, and therefore the holders of Class 3 Interests are entitled to vote to accept or reject the Plan.

## VI
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except as expressly set forth herein, to the extent the Debtor was a party or lessee to any executory contract and/or unexpired lease, respectively, as of the Petition Date, the Debtor shall

be deemed to have rejected each executory contract and unexpired lease to which it is a party, unless such contract or lease: (a) was previously assumed or rejected by the Debtor, (b) previously expired or terminated pursuant to its own terms, or (c) is sought to be assumed by this Plan (or other motion) on or before the Confirmation Date. Except as set forth below, the Confirmation Order shall constitute an order of the Court under Section 365 of the Bankruptcy Code approving the contract and lease rejections described herein, as of the Effective Date.

Notwithstanding any language to the contrary, the Debtor seeks, by this Plan, to assume its Lease as Landlord for the Property.[15]

No cure amounts exist with respect to such Unexpired Lease as the Debtor is the landlord of such tenant(s) and receives an accrual of rent or is paid rent from such tenant(s) (and does not owe any funds to such tenant(s) to be cured). Exclusively with respect to such Unexpired Lease, the Confirmation Order (or other Court order if applicable) shall constitute an order of the Court under Section 365 of the Bankruptcy Code approving such Unexpired Lease assumption.

Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, under Section 365(b)(1) of the Bankruptcy Code, at the option of the Debtor or the assignee of the Debtor assuming such contract or lease, by cure, or by such other treatment as to which the Debtor and such non-Debtor counterparty to the executory contract or unexpired lease shall have agreed in writing. If there is a dispute regarding the nature or amount of any cure, the ability of the Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or any other matter pertaining to assumption, the Debtor shall cure the same within thirty (30) days following the entry of a Final

---

[15] The Lease is for the operation of the catering facility (e.g. for weddings) and the restaurant. The Debtor receives rent and/or accrued rent from the tenants.

Order resolving the dispute and approving the assumption or the assumption and assignment, as the case may be.

If the rejection by the Debtor, pursuant to the Plan or otherwise, of an executory contract or unexpired lease results in a Claim that is not theretofore evidenced by a timely filed proof of claim or a proof of claim that is deemed to be timely filed under applicable law, then such Claim shall be forever barred and shall not be enforceable against the Debtor, unless a proof of claim is filed with the Clerk of the Court and served upon counsel for the Debtor within thirty (30) days of entry of the Confirmation Order.

## VII
## IMPLEMENTATION OF THE PLAN[16]

One of the Debtor's primary objectives, both before and since the Petition Date, has been to pursue a potential sale of its valuable Development Rights and/or to explore a sale of the Property as a whole. The Debtor submits that these assets possess substantial value that can be realized for the benefit of the Debtor and its creditors. Annexed as **Exhibit 6** is an appraisal of the Property from May 2026 indicating the value of the Property is $92 million.

The Debtor will accomplish and implement its Plan by one of the following:

(a) a global resolution with 135 WG, subject to Court approval[17];

(b) the Debtor will effectuate a private sale of the Property (including the Development Rights, together with the sale of the Opco Entities) and pay all classes of creditors in full, all

16 The terms "sale" and/or "sell" used herein mean that such asset(s) shall be sold "as is," "where is," "with all faults," without representations or warranties, unless expressly stated otherwise, with liens to attach to the sale proceeds, to the extent of the value of the collateral, in accordance with the lien priorities under the Bankruptcy Code and applicable state law.

17 The Debtor shall discontinue any such unconsummated potential global resolution with 135 WG once a purchase and sale agreement is entered in accordance with Plan implementation option (b).

administrative expenses in full, and the surplus to the member interests. Presently, the Debtor has an offer to purchase the Property from a third- party purchaser in excess of the amount necessary to pay 135 WG (the secured creditor) (approximately $60 million), all administrative professionals and the allowed unsecured creditors, which transaction is not subject to any financing contingency. The Opco Entities[18] will contribute to the Plan and the sale all assets, operations and contracts to such purchaser.[19] The Debtor and such third-party have entered an exclusive agreement to enter into a purchase and sale agreement for the Property (and Development Rights), and the Opco Entities by on or before August 21, 2026, or extended by written agreement of the parties to the purchase and sale agreement and further Order of the Court. The closing (the Effective Date of the Plan) will occur within 15 days of entry of the Order confirming the Plan unless extended by written agreement of the parties to the purchase and sale agreement and further Order of the Court. The Debtor has already engaged in extensive meetings and negotiations with the prospective purchaser and its counsel. The prospective purchaser has demonstrated substantial financial wherewithal, requiring no financing contingency, and is a highly sophisticated real estate and hospitality conglomerate with significant development projects throughout the world[20]; or

(c) in the event the conditions and time deadlines described in subparagraph (b) above have not been satisfied, the Debtor will sell by public auction sale the entire Property, the Development

---

18 The Opco Entities are Oheka Catering, Inc., Oheka Catering I, LLC, Oheka Management LLC (collectively operate the wedding, corporate and related hospitality events).

19 A critical benefit hereunder is the purchaser will assume all obligations in connection with all currently scheduled weddings (and events) in the ordinary course of business.

20 The Debtor will file such documents as are necessary and appropriate to the sale motion concerning evidence of the financial wherewithal of the prospective purchaser to consummate the sale transaction, including the types of financial documents that were reviewed by the Debtor demonstrating the same. To the extent necessary, the Debtor will also provide such financial documents necessary and appropriate to the Court and the United States Trustee for *in camera* inspection and 135 WG reserves its right to request the right to review the same and object to any *in camera* review.

Rights and the Opco Entities, pursuant to certain auction sale terms, conditions and procedures, with such auction sale terms and conditions to be submitted to the Court by separate motion for approval[21] by August 22, 2026, unless extended as above. The auction terms and conditions shall include the right of 135 WG to credit bid the Allowed amount of its claim.

## VIII
## FEASIBILITY

The Debtor submits that the Plan provides for two potential sale processes with respect to its assets to generate proceeds for the full payment of creditors within a reasonable period of time. The Plan further provides an efficient and beneficial mechanism for maximizing such recoveries for creditors to the greatest extent possible, in accordance with the priorities and requirements of the Bankruptcy Code and applicable non-bankruptcy law. Based upon the foregoing, the Debtor submits that the Plan is feasible, that the Debtor will be able to implement its provisions, and that the Plan therefore satisfies the feasibility requirement for confirmation

## IX
## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

The following are conditions precedent to the Effective Date that must be satisfied or waived:

1. The Bankruptcy Court shall have entered the Confirmation Order, which Confirmation Order shall confirm this Plan, and upon such Order having become a final Order.

2. There shall be no stay or injunction in effect with respect to the Confirmation Order.

## X
## VOTING

---

[21] As indicated above, the Debtor intends to achieve consensual proposed auction sale terms and conditions with 135 WG, with each the Debtor and 135 WG reserving all rights with respect thereto.

Under the Plan, Classes 1, 2 and 3 are impaired and entitled to vote. To be counted for voting purposes, ballots for the acceptance or rejection of the Plan must be received by the deadline set by the Bankruptcy Court, at Debtor's counsel's office, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Suite 201, Wantagh, New York 11793, Attn: Joseph S. Maniscalco, Esq.

## XI
## REQUIREMENT FOR CONFIRMATION OF THE PLAN

### A. Confirmation Hearing

The Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing to consider confirmation of the Plan. The Confirmation Hearing shall be scheduled by the Court to be held before the Honorable Louis A. Scarcella, in the United States Bankruptcy Court, Eastern District of New York, 290 Federal Plaza, Alfonse M. D'Amato U.S. Courthouse, Central Islip, New York 11722. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing.

### B. Objections to Confirmation

The Bankruptcy Court will direct that objections, if any, to Confirmation of the Plan be in writing, filed with the Bankruptcy Court with a courtesy copy to chambers of the Honorable Louis A. Scarcella, with proof of service and that such objections be served on or before such date as set forth in an additional notice or Order of the Court. Objections must be served upon (i) counsel to the Debtor, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Suite 201, Wantagh, New York, 11793, Attn: Joseph S. Maniscalco, Esq.; and (ii) the Office of the United States Trustee, 560 Federal Plaza, Alfonse M. D'Amato U.S. Courthouse, Central Islip, New York 11722. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

### C. Acceptance of the Plan

Section 1129 establishes the requirements for confirmation of a Chapter 11 plan. The requirements are numerous and differ depending on whether or not confirmation is consensual. If consensual confirmation is sought because all classes have accepted the plan, Section 1129(a) governs. Classes of Claims that are not impaired under the Plan are deemed to have accepted the Plan. Under the Plan, Classes 1, 2 and 3 are impaired, and as a result, such Classes are entitled to vote.

**D. Confirmation of the Plan**

In order to confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of determinations concerning the Plan, including: (i) that the Plan has classified Claims in a permissible manner; (ii) that the contents of the Plan comply with the technical requirements of the Bankruptcy Code; (iii) that the Plan has been proposed in good faith; and (iv) that disclosures concerning the Plan have been made which are adequate and include information concerning all payments made or promised in connection with the Plan and the Chapter 11 case. The Debtor believes that all of these conditions have been or will be met.

## XII
## EFFECT OF CONFIRMATION; INJUNCTION; EXCULPATION

**A. Effect of Confirmation**

On the Confirmation Date, the terms of this Plan bind all holders of all Claims against the Debtor, whether or not such holders accept this Plan.

**B. Injunction**

Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, effective on the Confirmation Date, all creditors who have held, hold, or may hold Claims against the Debtor, its assets or property are permanently enjoined from taking any of the following actions on account of such Claims: (i)

commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against the Debtor, its assets or property; (ii) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order against the Debtor, its assets or property; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, its assets or property other than as contemplated by the Plan; (iv) asserting any set-off, right of subrogation or recoupment of any kind directly or indirectly against any obligation due the Debtor, its assets or property; and (v) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan.

**C. Exculpation**

In accordance with Section 1125(e) of the Bankruptcy Code, the Exculpated Parties who provided services to the Debtor's estate during this Chapter 11 case will not have or incur any liability to any Person for any act taken or omission occurring on or after the Petition Date through the Effective Date of the Plan in connection with or related to this estate, including but not limited to (i) the commencement and administration of the Chapter 11 case, (ii) the operation of the Debtor during the pendency of the Chapter 11 Case, (iii) formulating, preparing, disseminating, implementing or confirming, the Plan (including soliciting acceptances or rejections thereof); or (iv) the Disclosure Statement or any contract, instrument, release or other agreement or document entered into or any action taken or omitted to be taken during the administration of the Chapter 11 case or in connection with the Plan.

Nothing in this section shall (i) be construed as a release of such Person's fraud, gross negligence or willful misconduct with respect to the matters set forth in this section, (ii) limit the liability of the Debtor's professionals to their respective clients pursuant to DR 6-102 of the Code

of Professional Responsibility, or (iii) release any Person from any obligations as guarantor or indemnitor regarding any debt owed by, or claim against, the Debtor.

## XIII
## ALTERNATIVES TO THE PLAN AND OTHER CONSIDERATIONS

### A. Alternatives to the Plan

The Debtor believes that the Plan provides creditors with the earliest and greatest possible value that can be realized on the respective Claims. The principal alternatives to confirmation of the Plan are: (i) dismissal of the case, or (ii) conversion of the case to chapter 7 of the Bankruptcy Code.

(i) Dismissal

By virtue of the proceeds the Debtor will distribute in connection with the Plan, the creditors stand to receive the maximum recovery possible on account of their Claims as set forth herein and, in the Plan, in accordance with the requirements of the Bankruptcy Code. Whereas, if the Plan is not approved and the case was to be dismissed, foreclosure of the Property is likely. In the event of a foreclosure (which might result in a liquidation value of $60 million), as is often the case, as applicable here, it is likely that only the secured lien holder would be made whole (approx. $56 million) or there may be a relatively small surplus available for junior creditors which includes administrative creditors before unsecured creditors would receive a recovery. In such event, priority and unsecured creditors would receive lesser or no distributions. Thus, dismissal would result in a wasted opportunity to maximize the value of the Debtor's assets and recovery for all creditors, to the detriment of most classes of creditors.

(ii) Conversion to Chapter 7

The Debtor submits that a conversion to Chapter 7 would not be in the best interests of creditors. As described in Section XIII (B) below ("Best Interests of Creditors"), liquidation of the

Debtor's assets under Chapter 7 of the Bankruptcy Code would not generate a greater distribution to creditors than as proposed under the Plan. Conversion to Chapter 7 of the Bankruptcy Code would entail the appointment of a case trustee. The additional administrative costs incurred by a trustee and its attorneys and professionals would also be substantial, and would substantially and negatively impact the ability of creditors to receive payments on their claims. The secured creditor would be compelled to grant a carve out of liens for the trustee and the trustee's professionals' administrative costs, thereby reducing recoveries on claims. Chapter 11 administrative claims would then next receive payment before other junior creditors. As stated in the dismissal scenario above it is likely that priority (if any) and unsecured creditors would receive lesser or no distributions on account of their claims.

The Debtor believes that confirmation of the Plan is preferable to the alternatives described above because the Plan maximizes the property available for distribution to Classes of Claims and appropriately distributes all the Debtor's assets to the creditors without the added Administrative Expenses of a Chapter 7 trustee and its attorneys and other professionals. In a Chapter 7, lower priority creditors would receive lesser or no distribution on account of their claims.

**B. <u>Best Interests of Creditors</u>**

Notwithstanding acceptance of the Plan by Classes of Claims, in order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all Classes of Claims. The "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of each impaired Class of Claims a recovery which has a present value at least equal to the present value of the distribution which each such creditor would receive from the Debtor if its assets were instead distributed by a trustee under Chapter 7 of the Bankruptcy Code. The Debtor believes that the Plan satisfies the "best interest test" with respect to all Classes of Claims since, the creditors will, in order of priority under the Bankruptcy Code, receive

payments under the Plan whereby more classes of creditors would receive recoveries, and of those receiving recoveries, senior and junior creditors would receive higher recoveries than they otherwise would under a Chapter 7 liquidation. Therefore, creditors will receive under the Plan not less than they would receive under a Chapter 7 liquidation.

Furthermore, as indicated above, in the event of a Chapter 7 liquidation, higher priority creditors including secured claimants might receive less than full value on their claims, and certainly priority and/or unsecured creditors would likely receive a lesser distribution or no distribution whatsoever.

The cost of converting the case to one under Chapter 7 would include the fees of a trustee, as well as those of the Chapter 7 trustee's counsel and other professionals that may be retained by the Chapter 7 trustee, and unpaid expenses incurred by the Debtor during the Chapter 11 case (such as fees for attorneys). Assuming a carve out was even obtained by a Chapter 7 trustee, these claims for Chapter 11 professionals would be paid from the Debtor's assets before its assets would be available to pay junior unsecured creditors, resulting in substantially less of a recovery by the trustee for these creditors of this estate.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE GREATEST POSSIBLE RECOVERY ON ACCOUNT OF CLAIMS AND THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS.

**C. <u>Liquidation Analysis</u>**

The Debtor believes that if the case were converted to a Chapter 7 case, unsecured creditors would receive no greater distribution on account of a liquidation of the estate than they would under the Plan. The secured creditor might be in jeopardy of receiving full payment on its claim, especially given the Chapter 7 trustee costs for which the trustee would seek a carve out of liens to cover the trustee's and professionals' administrative costs of liquidating the Property and

administering the estate. Administrative creditors from the Chapter 11 case would be paid ahead of any unsecured creditors. Lower priority creditors would then receive lesser or no distributions on account of their claims. In connection with its liquidation analysis, see **Exhibit 7** annexed hereto.

The Debtor believes that confirmation of the Plan is preferable to the alternatives described above because the Plan maximizes the value of all property available for distribution to all Classes of Claims in the most efficient and effective manner possible. Accordingly, the Debtor believes that confirmation of the Plan, rather than the alternatives described above, is in the best interests of creditors.

## XIV
## RECOMMENDATION OF THE DEBTOR

The Plan and this Disclosure Statement were drafted and submitted by the Debtor. As such, the Debtor strongly supports this Plan and believes that Confirmation of the Plan provides the Creditors with the best possible recovery in the shortest possible time.

## XV
## ADDITIONAL INFORMATION

Requests for information and additional copies of this Disclosure Statement, the Plan, and any other materials or questions relating to the Plan and this Disclosure Statement should be directed to Debtor's counsel, LaMonica Herbst & Maniscalco, LLP, 3305 Jerusalem Avenue, Suite 201, Wantagh, New York 11793, Attn: Joseph S. Maniscalco, Esq., at (516) 826-6500 during regular business hours.

## XVI
## TAX CONSEQUENCES

The Debtor is not aware of any tax consequences which may result from the confirmation of the Plan. Creditors should consult with their own tax advisor concerning any such tax related

implications. Creditors should consult with their tax advisor concerning (a) any deductions which may be applicable to them as bad debt deductions, or (b) income tax implications based upon forgiveness of debt, if applicable, based upon the provisions of the Debtor's Plan.

Pursuant to IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of Claims are hereby notified that (a) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims for the purpose of avoiding penalties that may be imposed on them under the Tax Code; (b) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (c) holders of Claims should seek advice based upon their particular circumstances from an independent tax advisor.

## XVII
## CONCLUSION

The Debtor believes the Plan is in the best interests of all Creditors.

Dated: August ___, 2026

**LaMonica Herbst & Maniscalco, LLP**
Attorneys for the Debtor

By: ___________________
Joseph S. Maniscalco, Esq.
Adam P. Wofse, Esq.
3305 Jerusalem Avenue, Suite 201
Wantagh, New York 11793
(516) 826-6500

Dated: August ___, 2026

**Kahn Property Owner, LLC**
Chapter 11 Debtor

By: ___________________
Kahn Associates, LLC
Gary Melius, Member/Manager