# EXHIBIT “A”

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Kahn Property Owner, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court | **Eastern District of New York** |
| Case number: | **25−72946** |

FILED
**U.S. Bankruptcy Court**
**Eastern District of New York**
10/14/2025
**Paul Dickson, Clerk**

Official Form 410
# Proof of Claim
**04/25**

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

Tabone LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|
| Tabone LLC | Tabone LLC |
| Name | Name |
| c/o Bond, Schoeneck & King, PLLC<br>68 S. Service Rd. 4FL<br>Attn: Justin S. Krell, Esq.<br>Melville, NY 11747 | Attn: John M. Tabone<br>217 Woodbury Road, #291<br>Woodbury, NY 11797 |
| Contact phone 631−761−0825 | Contact phone (516) 946−7301 |
| Contact email jkrell@bsk.com | Contact email tabonellc1@gmail.com |

Uniform claim identifier (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) ______ Filed on ______ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____________

**7. How much is the claim?**

$ 3000000.00

**Does this amount include interest or other charges?**
☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Transaction fee for services rendered

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410−A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: ____________

**Basis for perfection:** ____________

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ ____________

**Amount of the claim that is secured:** $ ____________

**Amount of the claim that is unsecured:** $ ____________ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ ____________

**Annual Interest Rate** (when case was filed) ______ %

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ ____________

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: ____________

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No<br>☐ Yes. *Check all that apply*: | **Amount entitled to priority** |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies | $ |

* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 10/14/2025
MM / DD / YYYY

/s/ John M. Tabone
Signature

Print the name of the person who is completing and signing this claim:

Name: John M. Tabone
First name Middle name Last name

Title: Managing Partner

Company: Tabone LLC
Identify the corporate servicer as the company if the authorized agent is a servicer

Address: 217 Woodbury Road, #291
Number Street
Woodbury, NY 11797
City State ZIP Code

Contact phone: (516) 946−7301 Email: tabonellc1@gmail.com

**BOND, SCHOENECK & KING PLLC**
Attorneys for Tabone LLC
68 South Service Road
Melville, NY 11747
Justin S. Krell
(631) 761-0825
jkrell@bsk.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

| | |
|---|---|
| In re: | Chapter 11 |
| KAHN PROPERTY OWNER, LLC, | Case No. 25-72946-LAS |
| Debtor. | |

-----------------------------------------------------------X

# RIDER TO PROOF OF CLAIM OF TABONE LLC

1. Basis for Claim

   This proof of claim (this "Claim") is asserted by Tabone LLC (the "Claimant") against Kahn Property Owner, LLC (the "Debtor") in the amount of $3,000,000.00, on account of a transaction fee owed to Tabone LLC pursuant to the terms of that certain Consulting Agreement dated April 3, 2024 and effective as of March 26, 2024, entered into by and between Kahn Property Owner, LLC, Gary Melius, and Tabone LLC, as amended by that certain Addendum 1 to Consulting Agreement dated May 19, 2024.

2. Classification of Claim

   This Claim is asserted as an unsecured claim in a liquidated amount. The Claimant, however, reserves its right to amend this Claim to assert a different classification and/or amount of this Claim.

3. Supporting Documents

   Attached to this Claim is a copy of the following documents:

   EXHIBIT A – Consulting Agreement entered into by and between Kahn Property Owner, LLC, Gary Melius, and Tabone LLC dated April 3, 2024.

   EXHIBIT B – Addendum 1 to Consulting Agreement by and between Tabone LLC, and Kahn Property Owner, LLC, and Gary Melius dated May 19, 2024.

   EXHIBIT C – Loan Term Sheet entered into by and between Vanbarton Partners LLC, as lender, and Kahn Property Owner, LLC, as borrower, dated July 22, 2024.

4. Reservation of Rights

The Claimant reserves the right to amend or supplement this Claim to reflect any additional claims against the Debtor, to specify interest, costs, expenses or other charges or claims incurred by the Claimant, and/or Claimant's professionals, and to file additional claims that may be based on the same or additional documents. The Claimant also reserves any and all rights, remedies, and recourse available to it pursuant to Orders of the Bankruptcy Court.

5. No Waiver

This Claim is filed to protect the Claimant from forfeiture of this Claim. The filing of this Claim is not: (a) a waiver or release of the Claimant's rights against any person, entity or property; (b) a waiver of the right to move to withdraw the reference or otherwise to challenge the jurisdiction of this reference or otherwise challenge the jurisdiction of the Bankruptcy Court; (c) an election of remedy; (d) a waiver of any rights or claims the Claimant has against the Debtor or any person or entity with respect to any pending or future litigation or to any matters related to such litigation; or (e) a waiver of past, present or future defaults or events of default.

6. Notices

All notices to the Claimant should be sent to:

Tabone LLC
c/o Bond, Schoeneck & King PLLC
68 South Service Road
Melville, NY 11747
Attn: Justin S. Krell, Esq.
(631) 761-0825
jkrell@bsk.com

# EXHIBIT A

# Tabone LLC

Mr. Gary Melius
135 West Gate Drive
Huntington, NY 11743

Dear Gary,

This Consulting Agreement is effective March 26, 2024 (the "Effective Date") by and between Kahn Property Owner, LLC ("Kahn") and Gary Melius, an individual who is the owner of Oheka Castle ("Melius"), Oheka Management LLC., Oheka Catering I LLC, Oheka Catering, Inc., Oheka Management Corp., (collectively the "Client") and Tabone LLC (hereinafter "TLLC"). The contract term is for twelve (12) months (the "Term") from the execution date of this Agreement and is non-cancellable.

## Engagement Scope

Tabone LLC (hereinafter "TLLC") is engaged, and authorized, by Client, to pursue a capital raise on its behalf to secure debt and/or equity solutions across the real estate capital structure which include, but not limited to, a structured first mortgage, CMBS, mezzanine financing, equity investments, assumption of debt, sale of securities, hospitality partnerships and joint ventures (the "Financing"). The objective of the engagement is to raise a minimum of $50,000,000 up to a maximum of $100,000,000 to preempt the current foreclosure and auction proceedings by the note holder to the property, i.e., Taconic Capital, and to provide capital to commence design, regulatory approval, and construction of a luxury condominium development project on the Oheka Castle Property to be known as The Residences at Oheka Castle. Any Financing must be satisfactory to the Client in the Client's sole and absolute discretion.

## Compensation

Compensation will consist of:

- **Retainer:** None. No retainer or billable hours. TLLC is undertaking this engagement on a success fee basis. TLLC is authorized to represent Client. The property address of Oheka Castle is 135 West Gate Drive, Huntington, NY 11743.

**Fee Structure**:

- TLLC shall earn a transaction fee of [500bp (5%)] (the "Fee") multiplied by the aggregate capital raised (debt and/or equity) at closing if during the Term, or afte he Term pursuant to a commitment, term sheet or letter of intent entered into, or accepted by Client. Client's use of proceeds is to: i) satisfy and discharge both the Tranche A and Tranche B Notes in the total amount of $50,554,496.60 as of March 1, 2024, excluding attorney fees and costs, held by Taconic Capital; and, i') for funding to commence design, egulatory app ova , and construction of The Residences at Oheka Castle.
- If Client decides to sell the property in whole or in part after this engagement is executed, a breakup fee in an amount equal to [100bp (1.00%)] multiplied by the sale price, less any applicable broker sales commission, will be payable to TLLC.
- If Client decides not to proceed with an agreed upon Financing after an expression of interest via a term sheet, letter of intent, contract or similar such written commitment has been executed, then TLLC shall be entitled to its full Fee.
- If within six (6) months after the expiration of the Term, the Client accepts a commitment or enters into a term sheet or letter of intent in connection with Financing sourced by TLLC, and a consummation of the Financing takes place at any time thereafter, TLLC shall be entitled to its Fee at closing.
- Given the non-exclusive nature of this engagement, Melius has agreed to a Fee split with any other party involved in pursuing Financing. To the extent any othe party, including Client, accepts a commitment or enters into a term sheet or letter of intent in connection with the Financing during the Term of this Agreement or within six (6) months after the expiration of the Term, and a consummation of the Financing takes place

anytime thereafter, Client shall pay TLLC 2.5% of the aggregate amount of the Financing.

- All payments are to be paid to TLLC by Client from escrow, a certified or bank check, attorney's check or wire transfer.

The Client represents and warrants as follows:

a) Kahn is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized;

b) The Client previously executed a term sheet with TLLC on March 8, 2024.

c) The execution and delivery by the Client of this Agreement, and the consummation by the Client of the transactions contemplated hereby, have been duly authorized by all necessary company actions;

d) The Client has duly executed and delivered this Agreement and this Agreement constitutes a legal, valid and binding obligation, enforceable, jointly and severally, against Kahn and Melius in accordance with its terms; and,

e) Client shall refer all inquiries from potential lenders, brokers or others in connection with the Financing to Tabone LLC.

Miscellaneous

a) TLLC is engaged, and authorized, to represent and provide advice to Client in connection with the Financing. TLLC is an independent contractor a not an employee of Client.

b) TLLC is relying upon information provided to it in connection with this engagement. Client agrees to defend, indemnify and hold harmless TLLC from any losses, claims, damages, judgments, costs or other liabilities or expenses (including legal fees) incurred in connection with, or as a result of, this engagement or any services provided pursuant to this Agreement including, but not limited to, losses, claims, damages, or liabilities caused by or arising out of any untrue statement of a material fact contained in information furnished to TLLC by the Client, unless such untrue statement of a material fact was caused by TLLC. The foregoing provisions shall survive the consummation of any transaction and any termination of the relationship established by the Agreement.

c) Any legal, accounting, due diligence, investment bank, registration, broker or other fees and expenses shall be borne by the Client.

d) This Agreement and the transactions contemplated hereby shall be governed by and construed according to the laws of the state of New York.

e) This Agreement constitutes the entire agreement among the parties hereto pertaining to the subject matter.

f) No supplement, modification, amendment, or waiver of this Agreement shall be binding unless executed in writing and signed by all parties.

g) This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto, their respective successors, heirs, estates, representatives and permitted assigns.

h) Section headings are not to be considered part of this Agreement and are included solely for convenience and are not intended to be full or accurate descriptions of the contents thereof.

i) Any notice or other communication pursuant hereto shall be given to each party as follows: In the case of TLLC to: Tabone LLC at 217 Woodbury Road, Unit 291, Woodbury, NY 11797 ATT: Mr. John Tabone and in the case of Client to: Mr. Gary Melius at 235 West Gate Drive, Huntington, NY 11743 by (i) commercial overnight mail via USPS with written verification of receipt, or (ii) registered or certified mail.

j) Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise by any of the parties hereto without the prior written consent of the respective other party, and any such assignment without such prior written consent shall be null and void.

**Dated: Wednesday, April 03, 2024**

**AGREED AND ACCEPTED:**
**Kahn Property Owner, LLC Gary Melius et al**

By: ____________________
Name: Gary Melius
Title: Owner

**AGREED AND ACCEPTED:**
**Tabone LLC**

By: ____________________
Name: John M. Tabone
Title: Managing Partner

# EXHIBIT B

# Tabone LLC

---

## Addendum 1 to Consulting Agreement By and Between Tabone LLC and Kahn Property Owner, LLC and Gary Melius

This Addendum 1 to the Tabone LLC Agreement with Kahn Property Owner, LLC and Gary Melius executed on April 2, 2024 (the "Agreement") reaffirm, modify and supplement certain Compensation provisions contained in the Agreement as follows:

### Compensation

- **Fee Structure:**
  - TLLC shall be paid a transaction fee of $3,000,000 on closing the $60,000,000 Preferred Equity Investment from Vanbarton Group, LLC (the "Vanbarton Investment") pursuant to the terms of the Agreement.
  - TLLC agrees to waive additional commissions due from any subsequent debt, equity investments or equity kickers, other than commission due for the Vanbarton Investment, in exchange for a top floor, Oheka Castle facing, condominium unit in The Residences at Oheka Castle development to be selected by TLLC.

All other language in the Agreement remains in effect and unchanged by this Addendum 1.

**Dated: Sunday, May 19, 2024**

| **AGREED AND ACCEPTED:**<br>**Kahn Property Owner, LLC Gary Melius et al** | | **AGREED AND ACCEPTED:**<br>**Tabone LLC** | |
|---|---|---|---|
| By: | | By: | |
| Name: | Gary Melius | Name: | John M. Tabone |
| Title: | Owner | Title: | Managing Partner |

# EXHIBIT C

EXECUTION VERSION

**VANBARTON PARTNERS LLC**
**292 Madison Avenue, 7th Floor**
**New York, New York 10017**

July 22, 2024

Kahn Property Owner, LLC
135 W Gate Dr.
Huntington, NY 11743
Attention: Gary Melius

Re: Loan (as defined below) from Lender (as defined below) to Borrower (as defined below) in connection with that certain real property known as Oheka Castle, located at 135 W Gate Dr., Huntington, NY 11743 (the "**Property**")

Dear Mr. Melius:

Pursuant to our discussions, the following (this "**Term Sheet**") sets forth the principal terms and conditions pursuant to which Vanbarton Partners LLC and/or one or more of its affiliates (collectively, "**Lender**") will make a mortgage loan (the "**Mortgage Loan**") to an existing (or to be formed) limited liability company (the "**Fee Owner**" or "**Mortgage Borrower**") and a mezzanine loan (the "**Mezzanine Loan**", and together with the Mortgage Loan, collectively, the "**Loan**") to an existing (or to be formed) limited liability company which will be the sole member of Mortgage Borrower (the "**Sole Member**" or "**Mezzanine Borrower**"). The Loan shall be in an amount up to approximately $60,000,000 (the "**Loan Amount**"). The Mortgage Loan shall be an amount estimated to be equal to $40,000,000 and the Mezzanine Loan shall be in an amount estimated to be equal to $20,000,000. The closing of the Loan (the "**Closing**") in accordance with this Term Sheet is subject to (i) completion of due diligence and underwriting on the transaction to Lender's satisfaction, in its sole discretion, including, but not limited to, satisfactory Collateral (defined below) evaluation, credit references, zoning and entitlement review (on the Property and Subdivided Parcel (each as defined below)), title review and title insurance policy, property insurance, and environmental assessment and (ii) satisfaction of all the terms set forth herein and in the definitive Loan documentation evidencing any such loan (the "**Loan Documents**").

| | |
|---|---|
| **Borrowers**: | Mortgage Borrower shall be a single member bankruptcy remote entity, governed by a single member limited liability company agreement, whose sole asset is the Property, and which is owned and controlled directly or indirectly by Guarantor (as hereinafter defined). The sole member of the Fee Owner shall be the Sole Member. If Mortgage Borrower is an existing entity, it will be a properly "recycled" single purpose, bankruptcy remote special purpose entity.<br><br>If applicable, Mezzanine Borrower (and together with Mortgage Borrower, collectively, as the context permits, "**Borrower**" or "**Borrowers**"), shall be a single member bankruptcy remote entity, |

| | |
|---|---|
| | governed by a single member limited liability company agreement, whose sole asset is 100% of the limited liability company membership interests in Mortgage Borrower (the "**Mezzanine Collateral**"), and which is owned and controlled directly or indirectly by Guarantor. The sole member of the Sole Member shall be Kahn Property Owner, LLC, a New York limited liability company (or a newly formed entity owned directly or indirectly by Gary Melius, the "**Company**"). If Mezzanine Borrower is an existing entity, it will be a properly "recycled" single purpose, bankruptcy remote special purpose entity.<br><br>The organizational documents of Fee Owner and Sole Member, as well as the ultimate ownership of these entities, must be satisfactory to Lender in all respects and shall include Article 8 opt-in language. |
| **Guarantor**: | Gary Melius |
| **Sponsor**: | Gary Melius |
| **Property; Collateral**: | The Property is currently located on approximately twenty-two (22 acres) of land. During the Term (as defined below), Fee Owner shall be permitted to subdivide the Property such that an area equal to five (5) acres shall become a separate parcel, unencumbered from the lien of the mortgage on the rest of the Property (the "**Subdivided Parcel**") and will be transferred and owned by an affiliate of Fee Owner (the "**Subdivided Parcel Fee Owner**"). After the subdivision, the remaining portion of the original Property shall continue to be referred to as the "**Property**".<br><br>As security for Lender's making of the Loan, Lender will require security documents typical for similar transactions, including, without limitation:<br><br>(a) a first priority mortgage on the Property and all improvements, amenities and appurtenances thereto solely in respect of the Mortgage Loan;<br>(b) a collateral assignment by Borrower of all rents and leases, personal property (inclusive of any and all FF&E), sales contracts, condominium rights, letters of credit and all design, development, service, management, leasing, approved plans and specifications, and construction contracts associated with the Property;<br>(c) a collateral assignment by Borrower of all bank accounts and deposits associated with the Property and an account control agreement with the related depository;<br>(d) a subordination and assignment of all affiliate management and development agreements relating to the Property, |



ACTIVE 699278820v6

| | |
|---|---|
| | together with the fees applicable thereunder, which Lender shall have the right to terminate after an event of default has occurred and is continuing;<br>(e) if applicable, the Mezzanine Collateral;<br>(f) if only the Mortgage Loan is originated by Lender, a UCC pledge of 100% of the equity interests of Mortgage Borrower;<br>(g) at such time as Fee Owner subdivides the Property and transfers the Subdivided Parcel to Subdivided Parcel Fee Owner, and as a condition precedent to the release of the Subdivided Parcel from the lien of the mortgage, Borrower shall cause Sponsor to deliver to Lender a pledge of Sponsor's one hundred percent (100%) ownership interest in Sponsor's member entity in the entity which owns, directly or indirectly, 100% of the Subdivided Parcel Fee Owner, pursuant to a pledge and security agreement acceptable to Lender, which pledge will, among other things, include Sponsor's rights to any and all distributions other than certain amounts ("**<u>Development Waterfall Distribution Leakage</u>**") to be set forth in the definitive Loan Documents and/or Subdivided Parcel development agreements, which Development Waterfall Distribution Leakage shall be subject to Lender's approval, and, if approved, shall be permitted to be reinvested in the Property (which reinvestment shall benefit both the Property and the Subdivided Parcel (e.g., building a spa)); and<br>(h) all reserves held by Lender. |
| **Subdivided Parcel Joint Venture Agreement**: | Lender shall have reasonable approval rights over (a) the developer/partner of Sponsor in that certain joint venture agreement between Sponsor, or an affiliate thereof, and any other member or developer (the "**<u>Subdivided JVA</u>**") and (b) the Subdivided JVA, which shall include, but not be limited to, approval over the following provisions: (i) distributions to Sponsor, or its affiliate, (ii) transfers of direct and indirect ownership interests in Sponsor or its affiliate, and (iii) the rights of Subdivided Parcel Fee Owner to sell the condominium units for certain minimum sales prices. |
| **Approved Operating Budget**: | Borrower will prepare, for approval by Lender, a detailed operating budget (as approved by Lender, the "**<u>Approved Operating Budget</u>**"). At Lender's option, the Approved Operating Budget will be attached to the Loan Agreement. |
| **Title**: | Borrower shall obtain at its sole cost and expense a Mortgagee Policy from Chicago Title Insurance Company or another title company satisfactory to Lender in its sole discretion and, if |

| | |
|---|---|
| | applicable, a UCC Plus Policy from UCCPlus, a division of Chicago Title Insurance Company. |
| **Loan Funding**: | Subject to the other provisions of this Term Sheet, the entire Loan Amount shall be funded by Lender at closing. The sources and uses of the Loan Amount shall be in accordance with a Sources and Uses statement to be delivered by Borrower at the closing of the Loan and subject to the approval of Lender (the "**Sources and Uses**"). |
| **Interest Rate**: | The Mortgage Loan and the Mezzanine Loan will bear respective interest rates such that, as between the Loans, there shall be a blended interest rate equal to 15.00% per annum subject to the interest deferral and Yield Maintenance provisions discussed below (the "**Blended Interest Rate**"). The Blended Interest Rate and principal payments, Yield Maintenance, deferred interest and Loan amortization shall be set forth in the definitive Loan Documents. On each monthly payment date, Mortgage Borrower and the Mezzanine Borrower shall be required to pay interest on the outstanding principal balance of the Mortgage Loan and the outstanding principal balance of the Mezzanine Loan such that the blended rate of such interest payments is at least ten percent (10.00%) per annum (collectively, the "**Current Interest**"). Borrower may elect, so long as there is no continuing Event of Default, to cause all accrued interest payments in excess of Current Interest to accrue itself and compound on a monthly basis at the Blended Interest Rate, becoming payable upon the expiration of the Term, or earlier repayment in full of the Loan. To the extent interest is not so deferred, it shall be due and payable on each monthly payment date. |
| **Yield Maintenance** | An amount that will be equal to, initially, twenty-four (24) months of interest at the Blended Interest Rate on the original Loan Amount. |
| **Amortization and Payments**: | The Loan will be interest only. Interest is payable on the first day of each month in arrears. All outstanding principal, interest (including all deferred interest) and fees are payable at maturity. Borrower permits Lender's servicer to draw from the applicable reserve in advance in order for payment to be received by Lender or other recipient by the respective due date due to processing time.<br><br>The proceeds of the sale of the condominium units on the Subdivided Parcel shall be used to pay down the outstanding principal balance of the Loan. |

| | |
|---|---|
| **Term**: | Subject to "Extension of Term" below, the Loan shall have a term of three (3) years (the "**Term**").<br><br>The Loan may be prepaid in whole, but not in part (except in connection with the sale of condominium units on the Subdivided Parcel), at any time. All prepayments of the Loan shall be accompanied by any applicable Yield Maintenance and Exit Fee (as hereinafter defined). |
| **Extension of Term**: | Borrower may cause the Term to be extended by one (1) year upon satisfaction of the following conditions:<br><br>1. Notice to Lender not less than sixty (60) days and not more than one hundred twenty (120) days prior to the initial expiration of the Term;<br>2. Compliance (a) in all material respects with all representations, warranties and non-financial covenants set forth in the Loan Documents and (b) with all financial covenants set forth in the Loan Documents; in each case, as set forth more specifically in the Loan Documents;<br>3. The Mezzanine Loan must be extended with the Mortgage Loan;<br>4. Payment of the Extension Fee;<br>5. Replenishment of the Interest Reserve in an amount equal to six (6) months of interest payment at the Current Interest rate;<br>6. No Event of Default under the Loan Documents and any other transaction documents; and<br>7. Any other conditions reasonably required by Lender set forth in the Loan Documents. |
| **Origination Fee**: | 1.0% of the Loan Amount, paid and earned at closing of the Loan. |
| **Extension Fee**: | 0.25% of the then outstanding principal balance of the Loan, payable as of the commencement of the extension term. |
| **Exit Fee**: | 0.50% of the Loan Amount, earned upon Closing but payable on maturity or any earlier repayment of the Loan. |
| **Equity Kicker**: | Upon payment in full of the Loan, Lender (or its designee) shall be paid a fee equal to the product of (x) seven and one-half percent (7.5%) and (y) either of (i) if the payment in full of the Loan is effectuated due to a sale of the Property (excluding, for the avoidance of doubt, the Subdivided Parcel, to the extent subdivided from the Property), the sale price of the Property, less actual closing costs, or (ii) if the payment in full of the Loan is effectuated for any reason other than a sale of the Property (excluding, for the |

Case 25-22946-las Doc 19-2 Filed 10/20/25 Entered 10/20/25 17:27

| | |
|---|---|
| | avoidance of doubt, the Subdivided Parcel, to the extent subdivided from the Property), the hypothetical sale price of the Property (based on an appraisal of the then fair market value of the Property acceptable to Lender), less assumed customary closing costs as determined in accordance with the Loan Documents. In the event Lender decides to sell the Equity Kicker to an unaffiliated third-party, Lender shall use reasonable efforts to first deliver notice to Borrower of its intent to sell the Equity Kicker; provided, however, that the failure of Lender to send such notice to Borrower shall in no way be a breach or default under the terms of the Loan Documents, and Borrower shall have no right to make any claims against Lender in such event. |
| **Cash Management**: | Upon the occurrence of an Event of Default, a lockbox and clearing account controlled by Lender (the "**Clearing Account**") shall be established by Borrower at a financial institution acceptable to Lender, into which all revenues from the Property shall be deposited. Amounts on deposit in the Clearing Account shall be transferred daily to an account controlled by Lender ("**CMA**") at a financial institution selected by Lender. Sums on deposit in the CMA shall be applied to payment of all monthly amounts due under the Loan Documents (including, without limitation, taxes and insurance, debt service and all other required reserves) and approved property operating expenses, with any excess funds being held by Lender as additional collateral for the Loan. In the event that Lender accepts a cure to an Event of Default or waives an Event of Default, it being acknowledged and agreed that Lender shall have no obligation to do either, then the cash management structure set forth above shall be paused, and all revenues can be deposited directly into Borrower's operating account, until the occurrence of a subsequent Event of Default. |
| **Conditions to Closing**: | It shall be a condition to Closing that Lender be satisfied in all respects with regard to all matters concerning the Property, Borrower, Guarantor and the Sponsor. Without limiting the foregoing, Lender shall have reviewed and be fully satisfied with, among other things, the following: (i) all management agreements, and other agreement relating to the operation of the hotel on the Property; (ii) financial information for Sponsor, Borrower and Guarantor; and (iii) third party reports, including, but not limited to, zoning, structural, geotechnical and environmental reports. |
| **Financial Covenants / Cures of Financial Covenants**: | The Loan Documents will permit Borrower to prepay a portion of the Loan, without the payment of any premium, penalty or Yield Maintenance, expressly excluding Exit Fee associated with such |



ACTIVE 699278820v6

| | |
|---|---|
| | principal reduction, in order to satisfy the foregoing financial conditions.<br><br>Guarantor Net Worth: to be set forth in the definitive Loan Documents.<br><br>Guarantor Liquidity: to be set forth in the definitive Loan Documents. |
| **Reporting Requirements**: | Borrower shall be required to submit monthly, quarterly and annual financial reports, which shall be in the form required by Lender, and such other customary reports reasonably requested by Lender and set forth in the definitive Loan Documents. In addition, Borrower shall be required to submit additional reporting required by Lender with respect to the sales of the condominium units at the Subdivided Parcel. |
| **Interest Reserve**: | On the Closing Date, Mortgage Borrower and Mezzanine Borrower shall each fund a reserve (the "**<u>Interest Reserve</u>**") in an amount equal to eighteen (18) months of its respective Current Interest, such that, on each payment date for the first eighteen (18) months of the Term, the Current Interest shall be disbursed from the Interest Reserve to Lender. Beginning on the date of the payment date that occurs in the seventeenth (17th) month of the Term, and reoccurring on each six (6)-month anniversary thereafter through the end of the Term, Borrower shall replenish the Interest Reserve in an amount equal to six (6) months of interest at the Current Interest rate. |
| **Borrower's Authority; Lender's Consent**: | Borrower shall oversee the day-to-day operations of the Property pursuant to the Approved Operating Budget.<br><br>During the Term, all actions of Borrower as described on **<u>Exhibit A</u>** shall be subject to Lender's approval in its sole and absolute discretion.<br><br>Borrower may, from time to time, make recommendations regarding proposed actions to be taken with respect to the Property, which proposed actions shall be subject to Lender's prior consent to the extent they constitute actions that would otherwise require Lender's approval as further set forth in the Loan Agreement. |
| **Events of Default**: | The Loan Agreement shall set forth certain standard and customary "**<u>Events of Default</u>**," which shall include, without limitation, (i) failure to pay the Loan in full on the maturity date, (ii) failure by Borrower to pay Current Interest on each payment date, (iii) failure by Borrower to apply the proceeds of the Loan in accordance with the Sources and Uses, (iv) a default (beyond applicable notice and |

| | |
|---|---|
| | cure periods) by Borrower of the terms of the Loan Documents, provided that Lender shall be reasonable in determining whether a default relating to a ministerial obligation (e.g., failure to deliver notice or a report timely) shall mature into an Event of Default, unless such default gives rise to loss or liability of Lender, (v) the occurrence of any event that is reasonably likely to result in liability pursuant to the indemnification set forth in the "Indemnity" section below, and (vi) a default (beyond applicable notice and cure periods) by the property manager or Property Owner under the Property Management Agreement (as defined below), or any affiliate under any affiliate agreement between such affiliate and Property Owner. |
| **Recourse and Other Guaranty Requirements**: | Guarantor, or such other affiliate of Sponsor acceptable to Lender, shall indemnify Lender with respect to the matters described on **Exhibit B**.<br><br>Guarantor shall indemnify, defend and hold Lender and Lender's directors, officers, employees and affiliates harmless from and against all demands, claims, proceedings, liens and judgments, and any losses, liabilities, damages, costs, or expenses, pertaining to or arising from the installation, generation, manufacture, production, storage or release of hazardous materials on or under the Property and the violation of any representations and warranties of Guarantors pertaining to the environmental condition of the Property. |
| **Property Management**: | A newly formed entity reasonably acceptable to Lender and owned, directly or indirectly, and controlled, by Gary Melius shall act as property manager of the Property and shall receive a property management fee as set forth in the property management agreement ("**Property Management Agreement**"), which is subject to the review and approval of Lender. |
| **No Other Fees**: | No fees shall be payable by Borrower or Mezzanine Borrower to Sponsor or any affiliates thereof, except as expressly provided herein, or otherwise approved by Lender. |
| **Participation; Transfer Rights**: | Lender shall have the right prior to closing or during the term of the Loan to assign, participate, or syndicate the Loan without the consent of Borrower. In addition, Lender, in its sole discretion, at Closing or during the term of the Loan, shall have the right to bifurcate each loan into two or more loans and/or mezzanine loans, in amounts as determined by Lender, and Borrower shall cooperate with any reasonable requests of Lender in connection therewith. For the avoidance of doubt, Borrower shall pay for all assignment, participation, syndication and bifurcation costs in connection with |

| | |
|---|---|
| | Loan closing, but not post Loan closing. Any bifurcation into a mezzanine loan shall require an intercreditor agreement acceptable to Lender which may not be provided to Borrower.<br><br>No direct or indirect owners of Borrower shall be permitted to transfer or pledge any direct or indirect interest in Borrower without Lender's express written consent, except for estate planning purposes and then only if the individuals that currently control Borrower continue to control Borrower at all times following any such transfer.<br><br>Subject to tax planning efficiency of the Borrower, which shall be further subject Lender's overall approval, the organizational structure and ownership of the Borrower is set forth above in the "Borrowers" section, and there shall be no transfers or pledges (except as provided in this Term Sheet), directly or indirectly, at any level or tier of ownership, of any legal or beneficial ownership interest in Borrower. |
| **Broker**: | Other than Tabone LLC (Sponsor's transaction advisor and consultant) (the "**Broker**"), Borrower represents and warrants to Lender that it has not dealt with any broker or any other party entitled to a fee by reason of the Loan. Sponsor shall be responsible for any and all fees and commissions due and payable to Broker. Sponsor, Borrower and Guarantor hereby agree to indemnify, defend and hold Lender harmless from and against any liability, cost or expense (including, without limitation, reasonable attorneys' fees) by reason of a breach of the foregoing representation and warranty, which indemnification obligation shall survive the execution and delivery of the Loan Documents and the Closing. |
| **Subordinate Financing:** | No direct or indirect financing (other than trade debt incurred in the ordinary course of business and included in the Approved Operating Budget), secured or unsecured, shall be permitted with respect to Borrower or the Property, including any preferred equity, without Lender's consent in its absolute discretion. |
| **Expenses**: | Upon signing and returning this Term Sheet, a good faith deposit in the amount of $100,000 (the "**Good Faith Deposit**") will be required, which will be applied toward Expenses (as defined below) and which shall be paid in accordance with Lender's wire instructions furnished to Sponsor. If at any time prior to closing of the Loan, Lender determines, in its reasonable discretion, that either (x) the unspent portion of the Good Faith Deposit will be insufficient to pay the Expenses in full, or (y) the unspent portion of the Good Faith Deposit is less than $25,000, Lender may require Borrower to increase the Good Faith Deposit and Borrower shall |

| | |
|---|---|
| | pay such additional amount to Lender upon demand. If Borrower timely furnishes all required due diligence materials to Lender, and Lender determines not to proceed with the Loan due to unsatisfactory results of its due diligence, the balance of the Good Faith Deposit, after payment of Expenses will be refunded to Borrower. If Borrower elects at any time not to proceed with the Loan, or Borrower fails to satisfy any of its obligation hereunder or to fulfill any of the conditions hereof, the balance of the Good Faith Deposit after the payment by Lender of the Expenses, will be retained by Lender. If Lender elects not to proceed with the Loan or has not pursued in good faith toward a closing of this transaction and Borrower is otherwise ready, willing and able to close and has performed its obligations hereunder, then, any unspent portions of the Good Faith Deposit shall be returned to Borrower.<br><br>For purposes herein, "**Expenses**" shall mean all actual out-of-pocket fees, costs and expenses incurred by or on behalf of Lender and the outside counsel and auditors retained by Lender in connection with the matters and transactions contemplated hereby, which Expenses shall be documented to the reasonable satisfaction of the Borrower and shall also include, but not be limited to, the fees of all third parties relating to the due diligence review to be undertaken by Lender and its third party consultants, title insurance, insurance review costs, the cost of an appraisal, environmental reports, engineering and structural reports, in each case, to the extent Lender provides to Borrower reasonable evidence of such expenses. |
| **Confidentiality**: | The parties hereby agree that neither party shall make any public announcement with respect to this Term Sheet or the transactions contemplated hereby, or disclose the terms or existence of this Term Sheet to any third party other than to their affiliates and respective officers, directors, consultants, employees, investors, members, partners, attorneys, accountants, lenders, advisors, representatives, and agents, on a need-to-know basis, for purposes of evaluating and negotiating the transactions contemplated by this Term Sheet. In the event that disclosure of this Term Sheet or any of its terms is requested or required by law or regulation, the parties shall consult with one another, if practicable, prior to such disclosure, which thereafter shall be permitted. |
| **Governing Law**: | This Term Sheet has been made and entered into under the laws of the State of New York (without regard to principles of conflicts of law) and said laws shall exclusively govern the interpretation of this Term Sheet. The parties hereto irrevocably submit to the exclusive jurisdiction of the federal and state courts located in the County of New York, State of New York for purpose of any suit, action or |

| | |
|---|---|
| | other proceeding arising out of this Term Sheet or any of the agreements or transactions contemplated hereby. |
| **Non-Binding**: | Subject to the last sentence of this paragraph, this Term Sheet is not intended to be binding and will not give rise to any right or obligation based on any legal or equitable theory (including any right to continue the negotiations or obligation to negotiate in good faith), and only the Loan Agreement and other documents contemplated by this Term Sheet, if executed and delivered by all parties, will bind the parties as to any matter which is the subject of this Term Sheet. Neither Lender nor any of its affiliates shall be responsible for payment of any fees, costs or expenses incurred by or on behalf of Sponsor or any of its affiliates in connection with the Property. Notwithstanding anything to the contrary contained herein, the provisions of "Broker", "Expenses", "Confidentiality", "Governing Law" and "Non-Binding" shall be binding upon the parties hereto and shall survive the termination of this Term Sheet. |
| **Counterparts** | This Term Sheet may be executed in any number of counterparts which taken together shall constitute one and the same, and/or by PDF or facsimile, and such signature shall be treated as an original for all purposes. |

[NO FURTHER TEXT ON THIS PAGE; SIGNATURES FOLLOW ON NEXT PAGE]

If the foregoing terms are acceptable to Sponsor, please arrange for countersignature of this Term Sheet where indicated below in order for us to memorialize our mutual intent.

Very truly yours,

VANBARTON PARTNERS LLC, ON BEHALF OF LENDER

By: ______________________
Name: DAMIANO BUFFA
Title: AUTHORIZED SIGNATORY

**AGREED AND ACCEPTED ON BEHALF OF BORROWER THIS 19 DAY OF JULY, 2024:**

KAHN PROPERTY OWNER, LLC

By: ______________________
Name: Gary Melius
Title: Authorized Signatory

**EXHIBIT A**

**APPROVAL RIGHTS**

The following shall require the prior approval of Lender:

1. Approving a budget, business plan, to the extent not already approved by Lender prior to the initial Closing of the Loan, and, in all events, any changes thereto (and taking any action in contravention of the approved budget (including establishing or liquidating reserves), business plan, or plans and specifications, as they may be modified from time to time in accordance with the Loan Documents) and incurring any charges not in accordance with the approved budget. Notwithstanding anything set forth herein, Borrower shall be permitted to change the Approved Operating Budget by not more than five percent (5%) in the aggregate, but shall not be permitted to increase or decrease any particular line item by more than ten percent (10%);

2. Approving a development manager and/or construction manager for the development of the Subdivided Parcel into 95 ultra-luxury condominiums;

3. Selling all or any portion of the Property, unless such transaction results in the repayment in full of the Loan; provided further, that such sale must be an arms-length transaction, to a bona-fide third party purchaser, in which purchaser neither Borrower, Guarantor nor any affiliate of either thereof shall be permitted to retain or acquire an ownership interest;

4. Incurring, modifying, extending or replacing any financing directly or indirectly secured by the Property or other indebtedness (other than trade debt incurred in the ordinary course of business and included in the Approved Operating Budget), unless such transaction results in the repayment in full of the Loan;

5. Instituting, defending or settling litigation involving the Property, or the Borrower, other than litigation involving an amount less than $150,000 (in the case of instituting or defending, the claim amount, and in the case of settlement, the settlement amount) or litigation covered by insurance;

6. Obtaining, modifying or cancelling insurance coverage, or settling an insurance claim in an amount exceeding $150,000, with respect to the Property or Borrower;

7. Causing or consenting to any bankruptcy action involving the Property or Borrower;

8. Voluntarily dissolving and winding up the Borrower;

9. Taking any action that would cause the Borrower to become an entity other than a Delaware limited liability company, to the extent Borrower is a Delaware limited liability company as of Closing;

10. Consolidating or merging the Borrower with any entity or otherwise effecting a reorganization or business combination with respect thereto unless such transaction results in a repayment in full of the Loan;

11. Modifying the organizational documents of the Borrower;

12. Making distributions to the members of the Borrower other than in accordance with the Loan Documents;

13. Making or guaranteeing a loan by or to the Borrower or Sole Member, to or from any member therein or third party or the extension of credit to any person or entity on behalf of the Borrower or Sole Member, as applicable;

14. Taking any action that is reasonably likely to result in an Event of Default under any Loan Document;

15. Entering into (to the extent entering into any particular agreement was not already approved by Lender prior to the Closing of the Loan), materially modifying, or terminating or waiving the compliance with any material provision therein, any agreement with the Borrower (on the one hand) and any asset manager, hotel manager, food and beverage provider, leasing agent, property manager, construction manager, general contractor or subcontractor, in each case, with respect to the Property (on the other hand);

16. Entering into, modifying, or terminating or waiving the compliance with any material provision of any commercial lease, hotel management agreement, food and beverage agreement or license agreement to which the Borrower is party with respect to the Property;

17. Approving or disapproving a creditors' plan or making any other material decision in any bankruptcy or similar proceeding involving any tenant or any guarantor of a tenant's obligations;

18. Settling or adjusting any material insurance claim or condemnation action;

19. Acquiring, directly or indirectly, any real property, any material tangible or intangible personal property or any interest therein, or any other material asset other than as set forth in the Approved Operating Budget;

20. Causing or permitting the Borrower or a subsidiary thereof to enter into or grant any material easement, right-of-way or similar encumbrance;

21. The giving of any indemnity bond or surety bond by the Borrower or Sole Member, except in the ordinary course of business;

22. Changing, or attempting to change, the use or zoning of the Property;

23. Taking any action that would have a disproportionately adverse effect on Lender;

24. Expanding the scope of business activities of the Borrower;

25. Hiring any employee of the Borrower (it being contemplated that there shall be no such employees);

26. Funding any reserve from Property cash flow other than as approved in the Approved Operating Budget; and

27. Changing the use of the Subdivided Parcel from anything other than the development of 95 ultra-luxury condominiums.

**EXHIBIT B**

**RECOURSE**

Guarantor shall be liable for any and all liabilities, costs, losses, damages and expenses (including, without limitation, reasonable attorneys' fees and disbursements of outside counsel and court costs, if any) incurred, suffered or sustained by Lender by reason of or in connection with the occurrence of any of the following:

a. fraud committed by any one or more of the Borrower, Sole Member, the Company, Sponsor, or Guarantor, and any officer, director, member, partner or other equity investor in any of the foregoing, acting at the direction of Sponsor or Guarantor, or any other Person that controls or is controlled by, in either case, directly or indirectly, or under common control with, any one or more of the foregoing (each, a "Sponsor Affiliate");

b. any intentional misrepresentation by any Sponsor Affiliate relating to the business of the Borrower or the Property or under the Loan Documents;

c. the breach of any environmental representation or covenant made by any Sponsor Affiliate in the Loan Documents or the breach of any environmental laws applicable to the Property;

d. the misappropriation or misapplication by any Sponsor Affiliate of (1) any insurance proceeds paid by reason of any loss, damage or destruction to the Property, (2) any awards or other amounts received in connection with the condemnation of all or a portion of the Property, or (3) any revenue from the Property;

e. the gross negligence or willful misconduct of any Sponsor Affiliate, including, but not limited to, criminal or unlawful acts;

f. intentional physical waste of the Property;

g. failure to pay any real estate taxes and similar charges;

h. failure to maintain insurance as required by the Loan Documents; and

i. the failure to pay charges for labor or materials or other charges that results in a lien on any portion of the Property.

The full amount of the Loan shall be fully recourse to Guarantor in the event of: (i) any voluntary bankruptcy action with respect to the Sole Member, Borrower or Guarantor; (ii) the acquiescence, consent, aid, solicitation or collusion by any Sponsor Affiliate in connection with any bankruptcy action against the Sole Member, Borrower or Guarantor; (iii) any act or omission by any Sponsor Affiliate, unless taken in good faith, as determined by a court of competent jurisdiction, which hinders, delays or interferes with Lender's exercise of its rights or enforcement of its remedies under the Loan Documents; (iv) the sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise,

and whether or not for consideration or of record) a legal or beneficial interest in the Borrower or the Property in violation of the Loan Documents; (v) a material breach by the Sole Member and Borrower with respect to the separateness covenants set forth in the Loan Documents and such failure is cited in connection with the substantive consolidation of such entity with another entity; or (vi) the breach of any representations or covenants relating ERISA, OFAC, PATRIOT Act, anti-money laundering or anti-terrorism contained in the Loan Documents by any Sponsor Affiliate.